# IN THE DISTRICT COURT OF THE UNITED STATES

## For the Western District of New York

_____

|  |  |
|---|---|
|  | **NOVEMBER 2018 GRAND JURY**<br>**(Impaneled  11/02/2018)** |
| **THE UNITED STATES OF AMERICA** | **SUPERSEDING INDICTMENT** |
| *-vs-* | **18-CR-108-EAW** |
| **ROBERT MORGAN**<br>(Counts 1, 6-10, 14, 29, 38-39, 46-47, 56-65, 68-70, 80-90, 92-98, 100, 111, 114) | **Violations:**<br>Title 18, United States Code,<br>Sections 1349, 1343, 1344, 1956(h) and 2 |
| **FRANK GIACOBBE**<br>(Counts 1, 2-5, 11-19, 21-31, 33-37, 40, 42-45, 48-56, 58, 60, 64-65, 79-80, 83-88, 90-92, 94-96, 114) | (114 Counts and 3 Forfeiture<br>Allegations) |
| **TODD MORGAN**<br>(Counts 1, 20-23, 29-36, 41-45, 49, 51-53, 66-79, 81-82, 89-90, 93-99, 101-110, 112-114) |  |
| **MICHAEL TREMITI**<br>(Counts 1, 76, 78, 114) |  |

## INTRODUCTION

### The Grand Jury Charges That:

1.      At all times relevant to this Indictment:

a.      Morgan Management, LLC ("Morgan Management"), based in Pittsford, New York, managed a portfolio of residential and commercial real estate properties owned by limited liability companies associated with defendant ROBERT MORGAN.  Grand Atlas Property Management LLC ("Grand Atlas") acquired Morgan Management in or about the summer of 2018 and thereafter managed the real estate portfolio.

b.      Aurora Capital Advisors, LLC, based in Buffalo, New York, was a commercial real estate firm engaged in the business of brokering loans for borrowers seeking financing for multi-family properties such as apartment complexes.

c.      Defendant ROBERT MORGAN was the managing member and chief executive officer of Morgan Management until its acquisition by Grand Atlas. In addition to his role with Morgan Management, Defendant ROBERT MORGAN and entities he controlled and managed owned a substantial portfolio of real estate holdings.

d.      Defendant FRANK GIACOBBE owned and operated Aurora Capital Advisors, identified himself as the Principal, and employed others to assist him in brokering, and attempting to broker, real estate loans.

e.      Defendant TODD MORGAN was a Project Manager at Morgan Management until its acquisition by Grand Atlas.

f.      Defendant MICHAEL TREMITI was the Director of Finance at Morgan Management until its acquisition by Grand Atlas.   After the acquisition, Defendant MICHAEL TREMITI was a part owner of Grand Atlas and the Senior Vice President of Finance through in or about the end of 2018.

g.      Patrick Ogiony was employed by and worked for defendant GIACOBBE as Managing Director at Aurora Capital Advisors.

h.      Kevin Morgan was a Vice President at Morgan Management through in or about May 2018.

i.      Scott Cresswell was the Chief Operating Officer at Morgan Management beginning in or about February 2016 through its acquisition by Grand Atlas. After the

acquisition, Scott Cresswell was a part owner of Grand Atlas and the President and Chief Executive Officer through in or about May 2019.

j.      Morgan Services LLC ( "Morgan Services"), based in Farmington, New York was a contracting business owned by defendant ROBERT MORGAN and his wife. Morgan Services LLC dissolved in approximately December 2016 and was replaced by Morgan Facilities LLC ("Morgan Facilities"), which conducted the same business as Morgan Services and was also owned by defendant ROBERT MORGAN and his wife.

k.      The Amherst Gardens Apartments ("Amherst Gardens") was a multi-family residential apartment complex located at 86 East Amherst Street, Buffalo, New York.

l.      Chesed Properties Buffalo, LLC ("Chesed Properties") was a limited liability company formed to purchase Amherst Gardens.

m.      The Avon Commons Apartments ("Avon Commons") was a multi-family residential apartment complex located at 597 Collins Street, Avon, New York.

n.      Morgan Avon Apartments, LLC ("Morgan Avon") was a limited liability company formed to purchase Avon Commons.

o.      The Eden Square Apartments ("Eden Square") was a multi-family residential apartment complex located at 9000 Old Station Road, Cranberry Township, Pennsylvania.

p.      Cranberry Vista Apartments, LLC was a limited liability company formed to purchase Eden Square.

q.      The Morgan Ellicott Apartments ("Morgan Ellicott") was a multi-family residential apartment complex located at 221 and 291 William Street, Buffalo, New York.

r.      Morgan Ellicott Apartments, LLC was a limited liability company formed to purchase Morgan Ellicott.

s.      The Rochester Village Apartments at Park Place ("Rochester Village") was a multi-family residential apartment complex located at 10100 Kettlecreek Drive, Cranberry Township, Pennsylvania.

t.      Park Place Pittsburgh, LLC ("Park Place") was a limited liability company formed to purchase Rochester Village.

u.      The Rugby Square Apartments ("Rugby Square") was a multi-family residential apartment complex located at 215 Dorchester Avenue, Syracuse, New York.

v.      Rugby Square, LLC was a limited liability company formed to purchase Rugby Square.

w.      The Reserve at Southpointe ("Southpointe") was a multi-family residential apartment complex located at 1000 Meadow Lane, Canonsburg, Pennsylvania.

x.      The Reserve at Southpointe, LLC was a limited liability company formed to purchase Southpointe.

y.      The Villas of Victor was a multi-family residential apartment complex located at 2000 Pebbleview Drive, Victor, New York.

z.      The Villas of Victor, LLC was a limited liability company formed to purchase the Villas of Victor.

aa.     Park Place of South Park was a multi-family residential apartment complex located at 1700 Patrick Place, South Park Township, Pennsylvania.

bb.     Park Place of South Park Apartment Homes, LLC was a limited liability company formed to purchase Park Place of South Park.

cc.     Ellison Heights Apartments ("Ellison Heights") was a multi-family residential apartment complex located at 1200-A Penfield Road, Penfield, New York.

4

dd.     Ellison Heights Apartments LLC was a limited liability company formed to purchase Ellison Heights.

ee.     Union Square Apartments ("Union Square") was a multi-family residential apartment complex located at 59 Union Square Boulevard, Chili, New York.

ff.     59 Union LLC was a limited liability company formed to purchase Union Square.

gg.     The Links at Centerpointe Townhomes ("Links at Centerpointe") was a multi-family residential apartment complex located at 2227 Brickyard Road, Canandaigua, New York.

hh.     Morgan Canandaigua Land, LLC was a limited liability company formed to purchase the Links at Centerpointe.

ii.     The Lakes at 8201, formerly named the Summerwood Apartments, was a multi-family residential apartment complex located at 8201 Polo Club Dr., Merrillville, Indiana.

jj.     Morgan Summerwood Apartments LLC was a limited liability company formed to purchase The Lakes at 8201.

kk.     Henrietta Highlands Apartments ("Henrietta Highlands") was a multi-family residential apartment complex located at 41 High Manor Drive, Henrietta, New York.

ll.     Morgan Henrietta Highlands LLC was a limited liability company formed to purchase Henrietta Highlands.

mm.    The limited liability companies ("LLCs") that purchased each of the properties referenced above at paragraphs (l) through (ll) were owned by other LLCs controlled or managed by one or more members of the conspiracy.

nn.     The Federal Home Loan Mortgage Corporation, known as "Freddie Mac," and the Federal National Mortgage Association, known as "Fannie Mae," were government sponsored enterprises formed by the United States Congress to increase the amount of money available in the mortgage lending market.

oo.     Arbor Commercial Mortgage, LLC ("Arbor") was a commercial real estate financing company based in Uniondale, New York and was approved to sell and service loans on behalf of Fannie Mae and Freddie Mac. Entities such as Arbor that sell and service loans on behalf of Fannie Mae and Freddie Mac are known within the commercial and multi-family mortgage industry as "seller-servicers." The seller-servicers issue the loans, which are then purchased by Fannie Mae and Freddie Mac. The seller-servicers then continue to service the loans after the sales to Fannie Mae and Freddie Mac.

pp.     Berkadia Commercial Mortgage, LLC ("Berkadia") was a commercial real estate financing company based in Horsham, Pennsylvania and acted as a seller-servicer on behalf of Fannie Mae and Freddie Mac.

qq.     UBS Real Estate Securities Inc. ("UBS") was a financial institution based in New York, New York, and was a wholly owned subsidiary of UBS Group AG, a Swiss global financial services company.

rr.     M&T Bank was a financial institution based in Buffalo, New York.

ss.     Evans Bank, N.A. was a financial institution based in Hamburg, New York.

tt.     ESL Federal Credit Union ("ESL") was a financial institution based in Rochester, New York.

uu.     Canandaigua National Bank & Trust ("Canandaigua National Bank") was a financial institution based in Canandaigua, New York.

vv.     Arbor, Berkadia, M&T Bank, Evans Bank, UBS, ESL and Canandaigua National Bank were financial institutions, as that term was defined in Title 18, United States Code, Section 20.

ww.     Colliers International ("Colliers") was a real estate services company that, among other things, appraised multi-family properties.

xx.     CBRE Group, Inc. ("CBRE") was a real estate services company that, among other things, appraised multi-family properties.

yy.     Capstone Construction Services, LLC was a general contracting firm based in Rochester, New York.

zz.     York Risk was an insurance adjuster working on behalf of insurance companies.

aaa.     Prudential Asset Resources Inc. ("Prudential Asset Resources") was a company that serviced commercial mortgage loans.

bbb.     A "rent roll" was a document listing, among other things: (1) all of the tenants in a multi-family property during a specific time frame; (2) the amount of rent paid by each tenant; and (3) the total rental income for the property during the time frame. The rent roll often also included the date the tenant began occupying the apartment listed on the rent roll.

ccc.     A "trailing twelve statement," commonly referred to as a "T12 statement" set forth the income for a property each month for the preceding twelve months.

ddd.     The "debt service coverage ratio" ("DSCR") for a property was a ratio of a property's income to its debt obligations, and was an indicator of whether a property could sustain its debt based on its income. Either increased income or decreased expenses on a

property resulted in a higher DSCR, holding other variables constant. A lender relied upon the DSCR in determining whether it would issue a loan, and thereafter continued to rely upon it in assessing a borrower's ability to meet its obligations going forward. If a loan failed to meet a certain DSCR after closing, the loan could be considered in default, providing the lender with contract-based options to protect itself.

## THE MULTI-FAMILY PROPERTY MORTGAGE LENDING PROCESS

2.      A multi-family property could be acquired by way of new construction or by purchasing an existing multi-family property. New construction could be funded with a short-term construction loan intended to finance the property during the period of construction. Construction loans often required the developer to invest a percentage of its own funds into the project before issuing the loan and drawing funds from the loan proceeds. A construction loan was paid off by a permanent loan once its occupancy reached a required threshold. As with construction loans, permanent loans required the borrower to invest a percentage of its own funds.

3.      Before a financial institution determined whether it would issue a permanent loan on a multi-family property, it typically evaluated various factors, including determining the property's value by using the property's income. Before issuing a construction loan, a financial institution typically evaluated factors including the cost of construction and the projected value of the property. In conducting their evaluations, lenders relied on representations made by potential borrowers concerning cost, value and income.

## COUNT 1

### (Conspiracy to Commit Wire Fraud and Bank Fraud)

### The Grand Jury Further Charges That:

1.     The allegations contained in the Introduction of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

2.     Beginning in or before 2007, the exact date being unknown to the Grand Jury, and continuing to in or about January 2019, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI did knowingly, willfully and unlawfully combine, conspire and agree together and with Kevin Morgan, Patrick Ogiony, Scott Cresswell, and others known and unknown to the Grand Jury, to:

a.     devise a scheme and artifice to defraud financial institutions and government sponsored enterprises and to obtain money and property from financial institutions and government sponsored enterprises by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, and the scheme and artifice affected financial institutions, in violation of Title 18, United States Code, Section 1343; and

b.     knowingly execute a scheme and artifice to defraud financial institutions and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions by means of materially false and fraudulent

pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

## OBJECTS OF THE CONSPIRACY

3.      It was an object of the conspiracy to induce financial institutions to issue mortgage loans based on false pretenses, representations and promises, which loans the institutions would not have issued, or would have issued with different terms.

4.      It was a further object of the conspiracy to provide the financial institutions servicing the mortgage loans with false information to conceal the misrepresentations that had induced the lenders to issue the loans, and to conceal the actual financial statuses of the properties so the lenders would continue to provide additional loans.

5.      It was a further object of the conspiracy to carry out and to execute the above-listed objects for the personal gain, benefit, profit, advantage, and accommodation of defendants ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI.

## MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE ACCOMPLISHED:

6.      The objects of the conspiracy were accomplished through the following means, among others:

a.      Morgan Management provided property management, accounting and financial reporting services for the properties owned by limited liability companies controlled by defendant ROBERT MORGAN.

b.    Defendants ROBERT MORGAN and MICHAEL TREMITI, and Kevin Morgan, as well as others known and unknown to the grand jury, conspired to manipulate income and expenses for properties to meet debt service coverage ratios ("DSCRs") required by lending institutions. The manipulation included, among other things, removing expenses from information reported to lenders.

c.    Defendants ROBERT MORGAN, MICHAEL TREMITI, and TODD MORGAN, and Kevin Morgan, as well as others known and unknown to the grand jury, conspired to present lending institutions with false and fraudulent inflated construction contracts and invoices that falsely reported to lending institutions that the contractors constructing properties were being paid more than the contractors were actually being paid.

d.    Defendants FRANK GIACOBBE, ROBERT MORGAN, MICHAEL TREMITI and TODD MORGAN, and Kevin Morgan and Patrick Ogiony, as well as other co-conspirators, known and unknown to the Grand Jury, provided false information to financial institutions and government sponsored enterprises that overstated net incomes of properties and thereby induced financial institutions to: (1) issue loans (a) for greater values than financial institutions would have authorized had they been provided with truthful information; and (b) that the financial institutions would not have issued at the time of issuance had they been provided with truthful information; and (2) forgo contractual rights that would have inured to the financial institutions had the defendants and Morgan Management presented accurate financial information to the financial institutions.

e.    Defendants FRANK GIACOBBE, ROBERT MORGAN and TODD MORGAN, and Kevin Morgan and Patrick Ogiony, as well as other co-conspirators, known and unknown to the Grand Jury, employed various mechanisms to mislead

inspectors, appraisers, financial institutions and government sponsored enterprises with respect to the occupancy of properties.

f.     Defendants FRANK GIACOBBE, ROBERT MORGAN, TODD MORGAN, and MICHAEL TREMITI, and other co-conspirators, known and unknown to the Grand Jury, falsely inflated the amounts owed on properties, by among other things, (1) providing false documentation of obligations purportedly associated with the properties, (2) misrepresenting the actual purchase prices of properties by providing false contracts and contract prices, and (3), as set forth above, presenting false construction contracts and invoices.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

7.     In furtherance of the conspiracy, the following acts, among others, were committed in the Western District of New York and elsewhere:

### Morgan Ellicott

a.     In or about March 2011, defendant FRANK GIACOBBE and defendant ROBERT MORGAN and others known to the Grand Jury caused a fictitious contract to be presented to Evans Bank, stating that Morgan Ellicott Apartments, LLC had contracted to purchase Morgan Ellicott for $5 million when, in truth and in fact, the purchase price was $3.1 million. Based in part on that misrepresentation, Evans Bank thereafter issued a $4.5 million loan for the purchase of Morgan Ellicott.

b.     In or about March 2013, in connection with efforts to refinance Morgan Ellicott, defendants FRANK GIACOBBE and ROBERT MORGAN, and others known to

the Grand Jury presented to UBS documents identifying a false and nonexistent $3.5 million loan purportedly owed on Morgan Ellicott. Based in part on this misrepresentation, UBS issued an $8.5 million loan on April 30, 2013.

      c.     Defendant FRANK GIACOBBE received a "broker fee payment" of $85,000 from the proceeds of the loan issued by UBS on or about April 30, 2013. On or about May 3, 2013, defendant ROBERT MORGAN also paid defendant FRANK GIACOBBE $85,000. On or about May 7, 2013, a co-conspirator known to the grand jury paid defendant FRANK GIACOBBE $50,000.

### Rugby Square

      d.     On or about February 22, 2012, Rugby Square, LLC acquired Rugby Square with a $5.56 million loan from M&T Bank, which was based on an appraised value of $7.52 million. Between or about September 18, 2012, and October 11, 2012, defendant FRANK GIACOBBE emailed false and inflated income documents to Colliers and Berkadia in connection with efforts by Rugby Square, LLC to refinance Rugby Square.

      e.     Thereafter, on or about October 25, 2012, Colliers issued an appraisal based in part on false information provided by defendant FRANK GIACOBBE, valuing the property at $13 million.

      f.     On or about December 20, 2012, Berkadia issued a $9 million loan to refinance the property which loan was subsequently purchased by Freddie Mac.

      g.     On or about December 20, 2012, defendant FRANK GIACOBBE received a payment of $90,000 from the proceeds of the loan. On or about December 21, 2012, a co-conspirator known to the Grand Jury paid defendant FRANK GIACOBBE $50,000. On or

about January 2, 2013, defendant ROBERT MORGAN paid defendant FRANK GIACOBBE $90,000.

### Avon Commons

h.      In December 2013, defendant ROBERT MORGAN signed a purchase contract on behalf of Morgan Acquisitions LLC to purchase the Avon Commons apartment complex for $5.9 million with an approximate $4.7 million loan from Evans Bank and an approximate $1.2 million loan from a fund financed by investors recruited by defendant ROBERT MORGAN. Approximately one year later, in or about December 2014, defendant ROBERT MORGAN obtained a $6.3 million loan from Arbor to pay off the December 2013 loans.

i.      On October 6, 2014, defendant FRANK GIACOBBE presented an Arbor employee with a payoff letter for the Morgan-related loan. After learning that Arbor would not pay off a loan from defendant ROBERT MORGAN'S investor fund, defendant FRANK GIACOBBE emailed defendant ROBERT MORGAN on October 7, 2014, attaching a false and fraudulent payoff letter for the Morgan-affiliated loan disguising that the loan was from a Morgan-affiliated fund. Defendant FRANK GIACOBBE then sent the fraudulent payoff letter to the Arbor employee.

j.      On or about October 26, 2014, CBRE issued an appraisal valuing the property at $8.1 million based in part on a misrepresentation by defendant FRANK GIACOBBE that Morgan Acquisitions had purchased the property for $8 million in December 2013 when, in fact, the purchase price was $5.9 million.

14

k.     On or about December 9, 2014, Arbor issued a $6.3 million loan, the amount of which was based in part on the misrepresentations that: (1) Morgan was indebted to United Income Partner's Fund 11% Notes Fund LLC in the amount of $1,371,316.67, and would use the proceeds of the loan to pay off that debt; and (2) Morgan Acquisitions had purchased the property in December 2013 for $8 million. Freddie Mac subsequently purchased the loan from Arbor.

l.     On or about December 9, 2014, defendant FRANK GIACOBBE received $63,000 in broker's fees from the proceeds of the $6.3 million loan.

### Rochester Village

m.     Between on or about October 27, 2014, and on or about April 6, 2015, defendants, FRANK GIACOBBE, ROBERT MORGAN, TODD MORGAN, and Kevin Morgan and Patrick Ogiony, in connection with efforts to obtain financing for Rochester Village, caused misrepresentations regarding storage income, rent rolls, property brochures and occupancy at the property.

n.     Between on or about January 14, 2015, and January 19, 2015, defendants FRANK GIACOBBE and TODD MORGAN, in connection with an inspection related to the effort to obtain financing for Rochester Village, staged the interior of an unoccupied unit to make it appear occupied, and as to other unoccupied units, turned radios on in the units and placed mats and shoes outside apartment doors to mislead inspectors into believing that the units were occupied.

o.     On or about May 5, 2015, Colliers issued an appraisal, based in part on false and fraudulent information provided by the defendants, valuing the property at $64 million.

p.      On or about May 12, 2015, Berkadia issued a $45.79 million loan that was subsequently purchased by Freddie Mac.

q.      On or about May 12, 2015, defendant FRANK GIACOBBE received a payment of $460,000 from the proceeds of the $45.79 million loan.

r.      Between in or about May 2015 and in or about the spring of 2017, defendant FRANK GIACOBBE and Kevin Morgan caused fraudulent rent rolls and financial statements to be submitted during quarterly loan servicing reports.

s.      On June 19, 2017, defendant ROBERT MORGAN sent an email to his real estate attorney requesting him to create a new master lease that more than doubled the monthly payment for a master lease Morgan Management had signed on the property.

t.      On June 20, 2018, defendant ROBERT MORGAN instructed the attorney to backdate the master lease to January 1, 2017.

**Southpointe**

u.      Between on or about April 10, 2015, and March 29, 2016, defendants, FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan and Patrick Ogiony, in connection with efforts to obtain financing from Arbor for Southpointe, inflated the number of storage units and parking spaces available, inflated storage and other income, and falsified rent rolls.

v.      On or about April 16, 2015, defendant TODD MORGAN sent defendant FRANK GIACOBBE and Kevin Morgan an email indicating that the property had a $35.258 million construction loan and a second loan for $5.3 million. On the same date, defendant FRANK GIACOBBE replied that he needed to show "payoffs," – in other

words, debts to be paid off – of $49 million on the property, and asked where to add additional debt. Also on the same date, Kevin Morgan forwarded defendant FRANK GIACOBBE's inquiry to defendant ROBERT MORGAN, and defendant ROBERT MORGAN instructed Kevin Morgan to allocate additional debt to a Morgan-related investor fund, which debt did not exist. Defendant FRANK GIACOBBE caused the fraudulent debt to be reported to Arbor.

w.    On or about May 9, 2016, CBRE issued an appraisal based in part on false information provided by the defendants, valuing the property at $60.5 million.

x.    On or about June 27, 2016, Arbor issued a $45 million loan which loan was subsequently purchased by Freddie Mac.

y.    On or about June 27, 2016, defendant FRANK GIACOBBE received a payment of $337,500 from the proceeds of the $45 million loan.

z.    In or about May 2017, defendants FRANK GIACOBBE and TODD MORGAN caused the creation of a false and fictitious rent roll and T12 statement in connection with an inspection to be conducted by Arbor related to the inclusion of the $45 million Southpointe loan in a mortgage-backed security.

aa.    In the spring of 2017, after becoming aware of an investigation into Morgan Management properties, defendant ROBERT MORGAN informed Kevin Morgan and others that he planned to create fictitious corporate leases for blocks of apartments in order to mask lower actual occupancy at Southpointe and other properties. He would then deposit or arrange for deposits of money into the apartments' accounts. Defendant ROBERT MORGAN then instructed Scott Cresswell to ask two contractors to sign fictitious leases for a number of apartments at the property and to make rent payments for those apartments as

a favor to defendant ROBERT MORGAN. Defendant ROBERT MORGAN would arrange for the contractors to be reimbursed for the rent payments.

bb.     On June 19, 2017, Scott Cresswell instructed a Morgan Management employee to lease nine vacant units each to Contractor 1 and Contractor 2, and to backdate the leases to April 1, 2017.

cc.     From June through August 2017, Contractor 2 made total rent payments of approximately $274,101.23 for which it was reimbursed by Morgan Management.

dd.     From June 2017 through September 2017, Contractor 1 made total rent payments of at least approximately $259,199.90, for which it was reimbursed by Morgan Management. In December 2017, Contractor 1 made a payment of $86,281.89, for which it was reimbursed in the amount of $70,290.

ee.     In September 2017, Wells Fargo, the master servicer for a securitized package of loans in which the $45 million Southpointe loan was included, received financial information for the property through the second quarter of 2017, which included a rent roll as of June 30, 2017. That rent roll listed the eighteen fictitious corporate leases for apartments purportedly occupied by employees of Contractor 1 and Contractor 2. The total purported rent for the eighteen apartments was $59,195, which accounted for 18.9 percent of the total reported rental income, $313,276.57. The eighteen fictitious leases also raised the occupancy of the building from 220 of 250 units (88.8 percent) to 238 out of 250 units (95.2 percent).


**Eden Square**

ff.     Between on or about October 24, 2016, and December 31, 2016, the

defendant FRANK GIACOBBE, Patrick Ogiony, and Kevin Morgan, in an effort to obtain financing from Berkadia for Eden Square, falsified rent rolls and T12s, altered lease contracts to misstate rents and fees, and provided them to Berkadia.

gg.     On or about October 24, 2016, in order to falsify radon testing required by Berkadia, defendant FRANK GIACOBBE instructed Kevin Morgan to place a radon detection canister in a vacant unit on the top floor of the building with the window cracked during radon testing, despite instructions from the radon testing company to place the canisters only in ground floor units.

hh.     Between on or about November 15, 2016, and on or about November 16, 2016, defendant FRANK GIACOBBE and others known and unknown to the Grand Jury provided false documents to Freddie Mac and Berkadia.

ii.     On or about November 18, 2016, CBRE issued an appraisal, based in part on false information provided by the defendants, including that the property was 95.8 percent occupied. The appraisal valued the property at $54 million.

jj.     On December 21, 2016, Berkadia issued a $42 million loan which loan was subsequently purchased by Freddie Mac.

kk.     On or about December 21, 2016, defendant FRANK GIACOBBE received a payment of $210,000 from the proceeds of the $42 million loan.

ll.     On or about December 31, 2016, defendant FRANK GIACOBBE caused Freddie Mac to be provided with a false and inflated rent roll for Eden Square.

mm.     In or about early March 2017, an employee of Eden Square, who was unaware of the scheme to defraud, provided an inspector conducting a pre-securitization inspection on behalf of Wells Fargo, the master servicer for a securitized package of loans in

which Eden Square was to be included, with an accurate rent roll showing the property less than seventy percent occupied. On or about March 15, 2017, Kevin Morgan sent an email to Berkadia, copying defendant ROBERT MORGAN, attempting to explain diminished occupancy rates between the December 2016 loan closing and March 2017.

### Villas of Victor

nn.    On or about January 26, 2010, defendant FRANK GIACOBBE caused an email to be sent to defendant ROBERT MORGAN attaching a false and inflated T12 statement that was subsequently provided to Arbor in connection with efforts to obtain a refinance loan for the Villas of Victor.

oo.    On or about February 19, 2010, defendant ROBERT MORGAN emailed Kevin Morgan to confirm that rent prices had been removed from the internet listing for the property. On the same date, Kevin Morgan emailed defendant ROBERT MORGAN, and defendant FRANK GIACOBBE, confirming "ALL RENTS ARE DOWN."

pp.    Prior to closing of a loan for the property, defendants ROBERT MORGAN and FRANK GIACOBBE conspired with Kevin Morgan and others known and unknown to the grand jury to provide Arbor with false and inflated rent rolls and income statements.

qq.    On or about May 13, 2010, Arbor issued two loans in a total amount of $11,390,072.68. The first mortgage, in the amount of $9,750,000 was subsequently purchased by Fannie Mae. The second mortgage, in the amount of $1,640,072.68 remained with Arbor. After the loans closed, the conspirators continued to produce false and inflated rent rolls and income statements during servicing of the loans, through 2016 and into 2017.

**Park Place of South Park**

rr.     On or about August 16, 2011, defendant ROBERT MORGAN signed a contract to purchase Park Place of South Park for $11,500,000. Between August 16, 2011, and September 15, 2011, defendant ROBERT MORGAN and defendant FRANK GIACOBBE created a second contract, representing a purchase price of $15,375,000.

ss.     On or about October 25, 2012, Berkadia issued a $13,800,000 loan, in reliance on the inflated purchase price of $15,375,000. The loan issued by Berkadia was subsequently purchased by Freddie Mac.

**Ellison Heights**

tt.     Between June 2016 and January 2019, defendants ROBERT MORGAN and TODD MORGAN caused the issuance and payment of a construction loan from ESL based on a false and inflated construction contract price.

uu.     Based in part on the inflated construction price, ESL issued a loan on September 30, 2016, in the amount of $32,000,000.

vv.     On or about July 17, 2017, defendant TODD MORGAN sent an email to defendant ROBERT MORGAN and Kevin Morgan attaching a spreadsheet reflecting an inflated contract price of $34,029,429 but an "actual amount to be paid" of $29,779,430. In the email defendant TODD MORGAN reported to defendant ROBERT MORGAN that, upon completion of the Ellison Heights project, there would be an excess of $1,711,312.14 in loan funds for the property.

ww.     On March 27, 2018, a Contractor 1 employee sent an email to defendant ROBERT MORGAN, defendant TODD MORGAN and Kevin Morgan attaching a

spreadsheet reflecting an inflated contract price of $34,029,429 but an "actual amount to be paid" of $30,482,785.

xx.    Through approximately December 2018, the conspirators presented ESL with fraudulent documents inflating the actual amounts they had paid Contractor 1, to enable conspirators to draw out the entire amount of the loan. On or about January 4, 2019, Contractor 1 signed an Owner Contract Change Order stating that its final contract sum was $30,482,785. That document was never disclosed to ESL.

## Union Square

yy.    On or about July 28, 2017, an employee of Contractor 3 sent an email to defendant TODD MORGAN attaching a construction contract in the amount of $17,984,000 to build Union Square. On the same date, defendant TODD MORGAN responded inquiring whether the contract was for Morgan Management's internal purposes or for the lender for the project. The Contractor 3 employee responded that the contract was for Morgan Management's internal use and that defendant TODD MORGAN needed to tell Contractor 3 what figure to use for the contract be provided to the bank. Defendant TODD MORGAN replied that the figure for the bank was $19,484,000. The Contractor 3 employee responded with an email attaching two contracts, one in the amount of $17,984,000 and one in the amount of $19,484,000.

zz.    On or about August 15, 2017, Capstone Construction Services, LLC prepared a preconstruction project analysis for Canandaigua National Bank based on the inflated contract amount of $19,484,000.

aaa.    On or about September 4, 2017, Canandaigua National Bank issued a

construction loan of $18,500,000 based in part on the false and inflated construction contract amount of $19,484,000.

## Links at Centerpointe

bbb.    On or about July 17, 2014, Kevin Morgan presented Canandaigua National Bank with fraudulent documents reflecting construction costs of $17,358,479 as part of $21,826,253 total costs for the property. Based in part on false information, Canandaigua National Bank issued a construction loan in the amount of $18,300,000 on or about January 21, 2015.

ccc.    In or about November 2016, defendant FRANK GIACOBBE caused the creation of a spreadsheet reflecting further inflated construction costs in a total amount of $22,785,268, and caused this falsely inflated financial information to be presented in connection with efforts to obtain permanent financing. Based in part on this false information, CBRE issued an appraisal valuing the property at $28,350,000. Arbor issued two loans – one for $21,140,000 and one for $2,926,616.88 – on January 12, 2017, based in part on the CBRE appraisal. Freddie Mac later purchased the $21,140,000 loan.

## Morgan Management Accounting and Financial Reporting

ddd.    From approximately 2007 through early 2016, defendants ROBERT MORGAN and MICHAEL TREMITI directed employees to move certain expenses off the books of properties to present false financial pictures of the properties during quarterly reporting to lending institutions and when Morgan Management sought to re-finance properties.

eee.    On April 7, 2016, Kevin Morgan sent an email to Morgan Management employees, including defendant MICHAEL TREMITI and copying defendant ROBERT MORGAN*, stating, "Guys – who is handling this? We should never send in financials that show DCR below where we need to be based on the loan docs." Later that same day, Kevin Morgan sent a second email to Morgan Management employees, including defendant MICHAEL TREMITI and copying defendants ROBERT MORGAN and TODD MORGAN, stating, "DSCR should be reviewed prior to sending in and if we do not meet the requirement we need to make adjustments so we do meet it."

**All in violation of Title 18, United States Code, Section 1349.**

## COUNTS 2-82
### (Wire Fraud)
### The Grand Jury Further Charges That:

1.    The allegations contained in the Introduction and Count 1 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.    Beginning in or before January 2010, the exact date being unknown to the Grand Jury, and continuing to in or about June 2017, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, AND MICHAEL TREMITI did devise, and intend to devise, a scheme and artifice to defraud financial institutions and government sponsored enterprises and for obtaining money and property from financial institutions and government sponsored enterprises by means of materially false and fraudulent pretenses, representations and promises, and the scheme and artifice affected financial institutions.

3.     On or about the dates set forth below, in the Western District of New York, and elsewhere, for the purpose of executing the scheme and artifice, the defendants set forth below, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as set forth below:

| RUGBY SQUARE | | | |
| --- | --- | --- | --- |
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| 2 | 09/04/2012 | FRANK GIACOBBE | Email to Rugby Square property manager stating that a false and inflated rent roll was the "updated rent roll that we are moving forward with (sic)." |
| 3 | 09/18/2012 | FRANK GIACOBBE | Email to Colliers employees in Columbus, Ohio attaching a false Rugby Square rent roll and a false Rugby Square T12 statement to Colliers. |
| 4 | 10/11/2012 | FRANK GIACOBBE | Email to Berkadia containing a certification by a co-conspirator of a false Rugby Square rent roll. |
| 5 | 12/05/2013 | FRANK GIACOBBE | Email to a co-conspirator's employee asking whether the co-conspirator had been providing the loan servicer with "regular" numbers or "inflated" numbers for Rugby Square. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **AVON COMMONS** | | | |
| **6** | 09/30/2014 | ROBERT MORGAN | Email from Kevin Morgan to defendant ROBERT MORGAN forwarding an email from Patrick Ogiony requesting a $1,439,075 payoff letter from Monroe Capital and asking "Robert can you get this?" |
| **7** | 09/30/2014 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Kevin Morgan responding "Yes" to the email referenced at Count 6. |
| **8** | 10/01/2014 | ROBERT MORGAN | Email to Monroe Capital requesting a payoff for Avon Commons. |
| **9** | 10/01/2014 | ROBERT MORGAN | Email from Monroe Capital indicating unfamiliarity with an Avon Commons loan. |
| **10** | 10/01/2014 | ROBERT MORGAN | Email to Monroe Capital acknowledging there was no Monroe Capital loan to be paid off. |
| **11** | 10/06/2014 | FRANK GIACOBBE | Email to a co-conspirator, known to the Grand Jury, with a payoff letter for Avon Commons for a fictitious debt to a Morgan Management-related entity, Morgan 11% Notes Fund, LLC. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **12** | 10/06/2014 | FRANK GIACOBBE | After a co-conspirator, known to the Grand Jury, replied to the email set forth in Count 11 stating that if the debt to a Morgan Management-related entity was not recorded it would be "considered a cash out" and "we would get f****d," defendant GIACOBBE responded with an email stating, "Ok. Let me see what I can do." |
| **13** | 10/07/2014 | FRANK GIACOBBE | Email to the co-conspirator referenced in Counts 11 and 12, stating, "Call me back as soon as possible." |
| **14** | 10/7/2014 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Email from defendant FRANK GIACOBBE to defendant ROBERT MORGAN, attaching a false and altered payoff letter for Avon Commons, replacing the name Morgan 11% Notes Fund, LLC with United Income Partners Fund 11% Notes Fund, LLC. |
| **15** | 10/07/2014 | FRANK GIACOBBE | Email to the co-conspirator referenced at Counts 11 through 13, attaching the false and altered payoff letter referenced at Count 14. |

| ROCHESTER VILLAGE | | | |
|---|---|---|---|
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **16** | 10/27/2014 | FRANK GIACOBBE | Email to Colliers attaching a false and inflated Rochester Village operating budget, T12 statement, and rent roll. |
| **17** | 10/30/2014 | FRANK GIACOBBE | Email to defendant FRANK GIACOBBE forwarding a true and accurate T12 income statement that Kevin Morgan had received earlier that day from a Morgan Management employee. |
| **18** | 10/30/2014 | FRANK GIACOBBE | Email to Patrick Ogiony forwarding the true and accurate T12 statement referenced in Count 17. |
| **19** | 10/28/2014 | FRANK GIACOBBE | Email to Kevin Morgan attaching a fraudulent and false and inflated "pro forma" document listing several categories of income and expenses for Rochester Village, including $72,900 in annual income for "storage space." The pro forma indicated that the $72,900 in income came from 180 storage units. |
| **20** | 10/29/2014 | TODD MORGAN | Email forwarding an email from the Rochester Village property manager stating that the property had 45 storage units. |

| | | | |
|---|---|---|---|
| **21** | 10/29/2014 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to defendant TODD MORGAN, copying Kevin Morgan and Patrick Ogiony, responding to the email referenced at Count 20 and asking "where did 72k come from on the proforma (sic)." |
| **22** | 10/29/14 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to defendant FRANK GIACOBBE, responding to the email referenced at Count 21, stating that the "72k" on the Rochester Village pro forma came from "magic". |
| **23** | 10/29/2014 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to Kevin Morgan, copying defendants TODD MORGAN and Patrick Ogiony, stating, "Guys now is not the time for the TRUTH!" |
| **24** | 11/05/2014 | FRANK GIACOBBE | Email to a representative of an investor falsely stating that Rochester Village had 180 storage units. |
| **25** | 11/18/2014 | FRANK GIACOBBE | Email to defendant FRANK GIACOBBE attaching conditional certificate of occupancy for Rochester Village construction building 19 restricting occupancy to only four apartment units and some common areas. |
| **26** | 11/18/2014 | FRANK GIACOBBE | Email to Kevin Morgan, copying Patrick Ogiony, stating "I see white out in our future." |
| **27** | 11/20/2014 | FRANK GIACOBBE | Email to Colliers falsely stating that Rochester Village "became one hundred percent occupied the month of October" and attaching a false and inflated T12 income statement. |

| 28 | 11/24/2014 | FRANK GIACOBBE | Email to a co-conspirator regarding Pizza Joe's, which was identified as occupied in a rent roll. |
|---|---|---|---|
| 29 | 12/11/2014 | FRANK GIACOBBE  ROBERT MORGAN  TODD MORGAN | Email to Kevin Morgan, copying defendant TODD MORGAN, stating that if the lender found out that Rochester Village did not have certificates of occupancy despite defendant FRANK GIACOBBE's representations that the property was one hundred percent leased, the lender would not close and stating, "I've tried everything so I suggest we jam it at the end and hope they don't notice." |
| 30 | 01/19/2015 | FRANK GIACOBBE  TODD MORGAN | Email to the Rochester Village property manager, copying defendants FRANK GIACOBBE and TODD MORGAN, asking whether radios left on during the January 14, 2015, inspection were still audible and whether mats were still in the hallways. |
| 31 | 01/19/2015 | FRANK GIACOBBE,  TODD MORGAN | Email to Kevin Morgan, copying defendant FRANK GIACOBBE, and identifying three units in which radios had been left on after conspirators staged apartments to appear occupied during an inspection. |
| 32 | 03/24/2015 | TODD MORGAN | Email to a Rochester Village property manager, copying defendant TODD MORGAN, asking the property manager to arrange for cars to be parked in the Building 1000 parking garage. |

| 33 | 03/24/2015 | FRANK GIACOBBE TODD MORGAN | Email to Patrick Ogiony and defendant KEVIN MORGAN, copying defendant GIACOBBE, attaching a true rent roll for Rochester Village. |
|---|---|---|---|
| 34 | 03/24/2015 | FRANK GIACOBBE TODD MORGAN | Email to Kevin Morgan and defendant TODD MORGAN, copying defendant GIACOBBE, requesting a copy of the Rochester Village marketing brochure without reference to "free cable." |
| 35 | 03/25/2015 | FRANK GIACOBBE TODD MORGAN | Email to Patrick Ogiony and defendant GIACOBBE, copying Kevin Morgan, attaching a fraudulent Rochester Village marketing brochure without reference to "free cable." |
| 36 | 03/30/2015 | FRANK GIACOBBE TODD MORGAN | Email to Kevin Morgan and defendant TODD MORGAN, copying defendant FRANK GIACOBBE, attaching a false and inflated rent roll. |
| 37 | 03/31/2015 | FRANK GIACOBBE | Email to defendant FRANK GIACOBBE with a list of apartments identified by the Rochester Village property manager as vacant but identified as leased or occupied on the rent roll. |
| 38 | 06/19/2017 | ROBERT MORGAN | Email to attorney instructing attorney to inflate master lease to $473,970 annually, and $39,497.50 monthly. |

| 39 | 06/20/2017 | ROBERT MORGAN | Email to attorney instructing attorney to backdate master lease referenced at Count 38 to January 1, 2017. |
|---|---|---|---|
| | | **SOUTHPOINTE** | |
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **40** | 04/10/2015 | FRANK GIACOBBE | After Patrick Ogiony sent Kevin Morgan an email asking for removal of "'Rent Includes: Cable TV'" from Southpointe web page and removal of "Cable Included" from the Southpointe website's "features and amenities" defendant GIACOBBE replied "BOOM". |
| **41** | 04/10/2015 | TODD MORGAN | Email to defendant TODD MORGAN regarding free cable advertised on Southpointe's website, responding to the emails referenced at Count 40, stating, "Todd wtf. This needs to be changed everywhere." |
| **42** | 04/10/2015 | FRANK GIACOBBE TODD MORGAN | Email to Kevin Morgan, copying defendants TODD MORGAN and Patrick Ogiony, responding to the emails referenced at Counts 40 and 41, stating: "Guys we need to be on our A Game to get max dollars." |
| **43** | 04/11/2015 | FRANK GIACOBBE TODD MORGAN | Email to defendant FRANK GIACCOBE and Kevin Morgan, copying Patrick Ogiony, responding to the emails referenced at Counts 40 to 42, stating, "I've removed 'cable included' from the Morgan communities website. I'll try to remove it from as many [ ] as I can." |

| 44 | 04/13/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to defendant FRANK GIACCOBE and Kevin Morgan, copying Patrick Ogiony, responding to the emails referenced at Counts 40 to 43, stating: "Update: I've been told items involving cable have been removed for Southpointe on the websites." |
|---|---|---|---|
| 45 | 04/16/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant FRANK GIACOBBE to Kevin Morgan and defendant TODD MORGAN, copying Patrick Ogiony and stating that he "need[ed] to show payoffs totaling around 49million (sic)" and asking where to claim the debt was owed. |
| 46 | 04/16/2015 | ROBERT MORGAN | Email from Kevin Morgan to defendant ROBERT MORGAN asking defendant ROBERT MORGAN how he wanted to respond to defendant FRANK GIACOBBE'S email referenced at Count 45. |
| 47 | 04/16/2015 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Kevin Morgan instructing him to attribute $5.3 million to Monroe Capital and remaining payoff to "morgan fund." |
| 48 | 11/03/2015 | FRANK GIACOBBE | Email to a co-conspirator, copying defendant FRANK GIACOBBE, providing false and inflated information about the number of parking spots and storage spaces at the property. |

| | | | |
|---|---|---|---|
| **49** | 03/29/2016 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to defendant FRANK GIACOBBE, Kevin Morgan and Patrick Ogiony forwarding an email from the Southpointe property manager attaching a document with rental information for the property stating that fewer than twenty storage units were occupied. |
| **50** | 03/29/2016 | FRANK GIACOBBE | Email to Patrick Ogiony instructing Patrick Ogiony to fill out a Southpointe rental information document "to match our economics." |
| **51** | 05/05/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to defendants FRANK GIACOBBE, TODD MORGAN and Patrick Ogiony attaching a true rent roll showing 84 percent occupancy, reporting that Arbor was scheduling an annual inspection, and stating "we are at 84% so we need to discuss a game plan." |
| **52** | 05/15/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to Kevin Morgan and defendant TODD MORGAN, copying defendant FRANK GIACOBBE, attaching a false and inflated T12 statement and a false and inflated rent roll "for servicing" of the loan. |
| **53** | 05/18/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email to Kevin Morgan and defendant FRANK GIACOBBE, copying defendant TODD MORGAN, attaching a false and inflated rent roll. |

| | | **AMHERST GARDENS** | |
|---|---|---|---|
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **54** | 07/21/2015 | FRANK GIACOBBE | Email to defendant FRANK GIACOBBE and to a co-conspirator with a false and inflated rent roll for Amherst Gardens. |

| | | **EDEN SQUARE** | |
|---|---|---|---|
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **55** | 10/24/2016 | FRANK GIACOBBE | Email to Kevin Morgan with instructions to place a radon detection canister in a vacant unit on the top floor of the building "with the window slightly cracked like a half an inch" despite instructions form the radon testing company to place the canisters only in ground floor units. |
| **56** | 03/15/2017 | FRANK GIACOBBE   ROBERT MORGAN | Email to defendants FRANK GIACOBBE and ROBERT MORGAN, proposing how to explain to Berkadia the number of vacancies after an Eden Square employee gave an inspector on site an accurate rent roll showing the property less than 70 percent occupied despite the loan having closed in December 2016 with false and inflated rent rolls reporting greater than 95 percent occupancy. |
| **57** | 03/15/2017 | ROBERT MORGAN | Email to Berkadia attempting to explain the current occupancy at Eden Square. |

| VILLAS OF VICTOR | | | |
|---|---|---|---|
| **58** | 01/26/2010 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from associate of defendant FRANK GIACOBBE to defendant ROBERT MORGAN, copying defendant FRANK GIACOBBE, attaching false and inflated T12 statement. |
| **59** | 02/19/2010 | ROBERT MORGAN | Email to Kevin Morgan requesting confirmation that rent prices had been removed from the property's website. |
| **60** | 02/19/2010 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email to ROBERT MORGAN and FRANK GIACOBBE confirming "ALL RENTS ARE DOWN." |
| PARK PLACE OF SOUTH PARK | | | |
| **61** | 08/22/2011 | ROBERT MORGAN | Email to attorney attaching inflated sales contract. |
| **62** | 08/23/2011 | ROBERT MORGAN | Email from attorney instructing that date of inflated sales contract should be the same date as the true sales contract. |
| **63** | 09/15/2011 | ROBERT MORGAN | Email to attorney requesting copies of true sales contract in Word version. |
| **64** | 09/15/2011 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email to associate of defendant FRANK GIACOBBE, copying defendant FRANK GIACOBBE, attaching Word version of true sales contract. |

| 65 | 09/15/2011 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from associate of FRANK GIACOBBE attaching an inflated sales contract purportedly signed by the seller from the true contract to be signed by a Morgan-affiliated middleman. |
|---|---|---|---|
| | | **ELLISON HEIGHTS** | |
| 66 | 09/20/2016 | TODD MORGAN | Email to ESL attaching a false and inflated schedule of value including an inflated construction cost. |
| 67 | 06/26/2017 | TODD MORGAN | Email to ESL attaching an inflated invoice. |
| 68 | 07/17/2017 | TODD MORGAN<br><br>ROBERT MORGAN | Email to defendant ROBERT MORGAN attaching spreadsheet reflecting inflated contract price and actual amount to be paid and indicating an excess of funds on Ellison Heights. |
| 69 | 07/17/2017 | ROBERT MORGAN<br><br>TODD MORGAN | Email to defendant TODD MORGAN responding to the email referenced at Count 68 attaching the spreadsheet with actual and inflated contract figures. |
| 70 | 03/27/2018 | ROBERT MORGAN<br><br>TODD MORGAN | Email from Contractor 1 attaching spreadsheet reflecting actual and inflated contract figures for Ellison Heights and other projects. |
| | | **UNION SQUARE** | |
| 71 | 07/28/2017 | TODD MORGAN | Email from Contractor 3 attaching contract for $17,984,000. |

| 72 | 07/28/2017 | TODD MORGAN | Email to Contractor 3 asking whether the contract referenced at Count 71 was for internal purposes or the contract to be presented to the lender. |
| 73 | 07/28/2017 | TODD MORGAN | Email to TODD MORGAN stating that the contract referenced at Count 71 was for internal purposes and defendant TODD MORGAN needed to tell Contractor 3 what figure to use for the contract to be presented to the lender. |
| 74 | 07/28/2017 | TODD MORGAN | Email to Contractor 3 requesting a contract to be presented to the lender in the amount of $19,484,000. |
| 75 | 07/28/2017 | TODD MORGAN | Email from Contractor 3 attaching two contracts, one containing the true figure, and one containing a figure to be presented to the lender. |
| **LINKS AT CENTERPOINTE** | | | |
| 76 | 07/28/2016 | MICHAEL TREMITI<br><br>TODD MORGAN | Email from Morgan Services employee attaching two documents revealing separate contract prices for Links at Centerpointe, one of which was the actual contract price, and one of which was presented to the lender. |
| 77 | 09/01/2016 | TODD MORGAN | Email from Morgan Services employee attaching two invoices, one of which reflected the actual contract amount and one of which reflected the inflated amount. |

| 78 | 09/01/2016 | TODD MORGAN<br><br>MICHAEL TREMITI | Email forwarding the email referenced at Count 77. |
|---|---|---|---|
| 79 | 09/16/2016 | TODD MORGAN<br><br>FRANK GIACOBBE | Email attaching inflated construction documents. |
| **NON-PROPERTY SPECIFIC** | | | |
| 80 | 08/28/2013 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Email from defendant ROBERT MORGAN to defendant FRANK GIACOBBE instructing defendant GIACOBBE not to have another co-conspirator advertise defendant ROBERT MORGAN'S deals in papers because "we don't want any other banks to see it. they might of (sic) seen numbers before, so we don't need issues". |
| 81 | 04/07/2016 | ROBERT MORGAN<br><br>TODD MORGAN | Email to Morgan Management personnel, copying defendants ROBERT MORGAN and TODD MORGAN, stating, "We should never send in financials that show DCR [DSCR] below where we need to be based on the loan docs." |

| 82 | 04/07/2016 | ROBERT MORGAN

TODD MORGAN | Email to Morgan Management personnel, copying defendants ROBERT MORGAN and TODD MORGAN, stating, "To reiterate, though, we should never put ourselves in this position. DSCR should be reviewed prior to sending in and if we do not meet the requirement, we need to make adjustments so we do meet it." |
|---|---|---|---|

**All in violation of Title 18, United States Code, Section 1343.**

## COUNTS 83-96
### (Bank Fraud)
### The Grand Jury Further Charges That:

1.       The allegations contained in the Introduction and Counts 1 through 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.


2.       On or about the dates set forth below, in the Western District of New York and elsewhere, the defendants set forth below did knowingly execute, and attempt to execute, a scheme and artifice to defraud financial institutions and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions by means of materially false and fraudulent pretenses, representations and promises, with respect to the loans set forth below by date, property, borrower, loan amount, and financial institution:

| Count | Date | Defendant(s) | Property | Borrower | Loan Amount | Financial Institution |
|---|---|---|---|---|---|---|
| **83** | 05/13/2010 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Park Place of South Park | Park Place of South Park Apartment Homes, LLC | $9,750,000 | Arbor Commercial Mortgage, LLC |
| **84** | 05/13/2010 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Park Place of South Park | Park Place of South Park Apartment Homes, LLC | $1,640,072.68 | Arbor Commercial Mortgage, LLC |
| **85** | 10/25/2012 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Villas of Victor | The Villas of Victor, LLC | $13,800,000 | Berkadia Commercial Mortgage, LLC |
| **86** | 12/20/2012 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Rugby Square | Rugby Square, LLC | $9,000,000 | Berkadia Commercial Mortgage, LLC |
| **87** | 04/30/2013 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Morgan Ellicott | Morgan Ellicott Apartments, LLC | $8,500,000 | UBS Real Estate Securities, Inc. |
| **88** | 12/9/2014 | FRANK GIACOBBE<br><br>ROBERT MORGAN | Avon Commons | Morgan Avon Apartments, LLC | $6,300,000 | Arbor Commercial Mortgage, LLC |
| **89** | 01/21/2015 | ROBERT MORGAN<br><br>TODD MORGAN<br><br>MICHAEL TREMITI | Links at Centerpointe | Morgan Canandaigua Land, LLC | $18,300,000 | Canandaigua National Bank |

| Count | Date | Defendant(s) | Property | Borrower | Loan Amount | Financial Institution |
|---|---|---|---|---|---|---|
| **90** | 05/12/2015 | FRANK GIACOBBE<br><br>ROBERT MORGAN<br><br>TODD MORGAN | Rochester Village | Park Place Pittsburgh, LLC | $45,791,000 | Berkadia Commercial Mortgage, LLC |
| **91** | 09/30/2015 | FRANK GIACOBBE | Amherst Gardens | Chesed Properties Buffalo, LLC | $11,000,000 | Arbor Commercial Funding, LLC |
| **92** | 06/27/2016 | FRANK GIACOBBE<br><br>ROBERT MORGAN<br><br>TODD MORGAN | Southpointe | The Reserve at Southpointe, LLC | $45,000,000 | Arbor Commercial Mortgage, LLC |
| **93** | 09/30/2016 | ROBERT MORGAN<br><br>TODD MORGAN | Ellison Heights | Ellison Heights Apartments, LLC | $32,000,000 | ESL |
| **94** | 12/21/2016 | FRANK GIACOBBE<br><br>ROBERT MORGAN<br><br>TODD MORGAN | Eden Square | Cranberry Vista Apartments, LLC | $42,000,000 | Berkadia Commercial Mortgage, LLC |
| **95** | 01/12/2017 | FRANK GIACOBBE<br><br>ROBERT MORGAN<br><br>TODD MORGAN | Links at Centerpointe | Morgan Canandaigua Land, LLC | $21,140,000 | Arbor Commercial Mortgage, LLC |

| Count | Date | Defendant(s) | Property | Borrower | Loan Amount | Financial Institution |
|-------|------|--------------|----------|----------|-------------|-----------------------|
| **96** | 01/12/2017 | FRANK GIACOBBE<br><br>ROBERT MORGAN<br><br>TODD MORGAN | Links at Centerpointe | Morgan Canandaigua Land, LLC | $2,926,616.88 | Arbor Commercial Mortgage, LLC |
| **97** | 09/04/2017 | ROBERT MORGAN<br><br>TODD MORGAN | Union Square | 59 Union Square | $18,500,000 | Canandaigua National Bank |

**All in violation of Title 18, United States Code, Sections 1344 and 2.**

## COUNT 98

### (Conspiracy to Commit Wire Fraud)

### The Grand Jury Further Charges That:

1.    The allegations contained in the Introduction and Counts 1 through 97 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

2.    Beginning in or before March 2017, the exact date being unknown to the Grand Jury, and continuing to in or about November 2018, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, and TODD MORGAN did knowingly, willfully and unlawfully combine, conspire and agree together and with Kevin Morgan and Scott Creswell and others known and unknown to the Grand Jury, to devise a

scheme and artifice to defraud insurance companies and for obtaining money and property from insurance companies by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, and the scheme and artifice affected financial institutions, in violation of Title 18, United States Code, Section 1343.

## OBJECTS OF THE CONSPIRACY

3.      It was an object of the conspiracy to induce the insurance companies to issue payments on insurance claims for multi-family residential properties in the Robert Morgan portfolio in excess of the actual amount to repair those properties after damage to the properties.

4.      It was a further object of the conspiracy to carry out and to execute the above-listed objects for the personal gain, benefit, profit, advantage, and accommodation of defendant ROBERT MORGAN.

## MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE ACCOMPLISHED:

5.      The objects of the conspiracy were accomplished by submitting to insurance companies false and inflated contracts for property repairs and false and inflated invoices representing purported payments to construction firms in excess of actual payments to those firms.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

6.     In furtherance of the conspiracy, the following acts, among others, were committed in the Western District of New York and elsewhere:

## Lakes at 8201/Summerwood Apartments

7.     On or about March 8, 2017, Contractor 4 sent Kevin Morgan a false and inflated contract for repairs at the property in the amount of $3,236,519.

8.     On or about March 20, 2017, Contractor 4 sent Kevin Morgan the actual contract for repairs at the property in the amount of $2,500,000.

9.     During the course of the conspiracy, on or about July 11, 2017, a Prudential employee emailed Scott Cresswell, copying defendant TODD MORGAN and Kevin Morgan stating that the Master Servicer for the Summerwood loan was requesting cancelled checks for payments to the contractor. In lieu of cancelled checks, Prudential later accepted a form, signed by defendant ROBERT MORGAN, falsely certifying $970,955.70 in payments to Contractor 4 for the property.

10.     On or about April 20, 2018, Scott Cresswell emailed a Prudential employee attaching an inflated final invoice reflecting total payments of $3,236,519.

11.     Between March 2017 and November 2018, insurers made payments based on false and fraudulent invoices and contracts that defendant ROBERT MORGAN caused to be submitted by Scott Cresswell and others known and unknown to the grand jury.

**Eden Square**

12.     On May 2, 2017, a Contractor 1 employee sent an email to defendant TODD MORGAN and Kevin Morgan asking what amount should be entered on the contract to be presented to York Risk, the adjuster hired by the insurance companies to manage the claims, in connection with repairs Contractor 1 was to perform at Eden Square.

13.     On May 3, 2017, defendant TODD MORGAN replied that the invoice should be "right around the number $263,013.57." On the same date, defendant TODD MORGAN sent an additional email, adding, "If you could also date the invoice closer to when you finished all of the work that would be great." On May 4, 2017, Contractor 1 sent defendant TODD MORGAN and Kevin Morgan one email reflecting an inflated invoice for $263,013.57 and a second email with an actual amount of $174,999.

14.     Between March 2017 and July 2017, insurers made payments based on the false and fraudulent invoices and contracts provided by defendant TODD MORGAN and others known and unknown to the grand jury.

**Catastrophic Claim From March 2017 Storm**

15.     On or about March 8, 2017, a windstorm in the Rochester, New York metropolitan area damaged thirty-four properties in the Morgan multi-family residential portfolio. Morgan Facilities was contracted to do the work or to act as the general contractor to repair or coordinate the repair of the damage on all of the properties. Defendant ROBERT MORGAN and Scott Cresswell caused the presentation of inflated contracts to York Risk, the adjuster hired by the insurance companies to manage the claims.

16.     Between June 2017 and January 2018, insurers made payments based on the false and fraudulent invoices and contracts that defendants ROBERT MORGAN and TODD MORGAN caused to be provided by Scott Cresswell and others known and unknown to the grand jury.

**All in violation of Title 18, United States Code, Section 1349.**

## COUNTS 99-113
### (Wire Fraud)
### The Grand Jury Further Charges That:

1.     The allegations contained in the Introduction and Counts 1 through 98 of this Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.     Beginning in or before March 2017, the exact date being unknown to the Grand Jury, and continuing to in or about November 2018, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, and TODD MORGAN, did devise, and intend to devise, a scheme and artifice to defraud insurance companies and for obtaining money and property from insurance companies by means of materially false and fraudulent pretenses, representations and promises, and the scheme and artifice affected financial institutions.

3.     On or about the dates set forth below, in the Western District of New York, and elsewhere, for the purpose of executing the scheme and artifice, the defendants set forth below, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as set forth below:

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| LAKES AT 8201/SUMMERWOOD APARTMENTS | | | |
| **99** | 07/11/2017 | TODD MORGAN | Email from financial institution stating that the master servicer on the loan for the property requested copies of cancelled checks made to the contractor for the insurance work. |
| **100** | 01/31/2018 | ROBERT MORGAN | Email to Prudential Asset Recovery attaching document falsely certifying $970,955.70 in payments to Contractor 4. |
| EDEN SQUARE | | | |
| **101** | 03/27/2017 | TODD MORGAN | Email from Kevin Morgan to Scott Cresswell, copying defendant TODD MORGAN, informing him that the repair work for Eden Square was being done "for much cheaper than insurance is giving us." |
| **102** | 04/26/2017 | TODD MORGAN | Email from Contractor 1 stating that although the contract amount for the repair was "$181k" it appeared the final amount would be "174k" and asking if Morgan Management needed a different invoice for insurance. |
| **103** | 05/02/2017 | TODD MORGAN | Email from Contractor 1 asking if there was a number yet to use on an invoice for insurance. |
| **104** | 05/03/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 1 asking for the insurance invoice to be "right around the number: $263,013.57." |

48

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **105** | 05/03/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 1 asking Contractor 1 to "date the [inflated] invoice closer to when you finished all of the work." |
| **106** | 05/04/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 1 asking if he could get the inflated invoice "today". |
| **107** | 05/04/2017 | TODD MORGAN | Email from Contractor 1 responding to the email referenced at Count 106 and stating, "For sure. Send over in a bit." |
| **108** | 05/04/2017 | TODD MORGAN | Email from Contractor 1 to defendant TODD MORGAN attaching the true and accurate invoice reflecting a final cost of $174,999. |
| **109** | 05/05/2017 | TODD MORGAN | Email from Contractor 1 attaching the false and inflated invoice requested by defendant TODD MORGAN. |
| **110** | 05/05/2017 | TODD MORGAN | Email from Kevin Morgan to Scott Cresswell forwarding the email referenced at Count 108, attaching the true and accurate invoice for the repair work. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|--------------|-----------------------------------|
| **CATASTROPHIC CLAIM MARCH 2017** | | | |
| **111** | 06/07/2017 | ROBERT MORGAN | Email from defendant ROBERT MORGAN acknowledging email from Morgan Facilities indicating the total cost to repair roofs at Henrietta Highlands would be $618,840 and requesting confirmation that it was "Morgan pricing and bottom pricing." |
| **112** | 07/10/2017 | TODD MORGAN | Email from Morgan Facilities to Scott Cresswell and defendant TODD MORGAN attaching document showing a contract sum of $615,762 for Henrietta Highlands. |
| **113** | 09/15/2017 | TODD MORGAN | Email from Morgan Management employee indicating a total of $622,602 of invoices for Henrietta Highlands. |

**All in violation of Title 18, United States Code, Section 1343.**

## COUNT 114

**(Money Laundering Conspiracy)**

**The Grand Jury Further Charges That:**

1.      The allegations of the Introduction and in all of the paragraphs of the Superseding Indictment are incorporated herein by reference.

2.      Beginning in or about 2007, the exact date being unknown, and continuing to in or about June 2017, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL

TREMITI, together and with others, known and unknown to the Grand Jury, knowingly combined, conspired and agreed among themselves to commit offenses against the United States in violation of Title 18, United States Code, Section 1957, that is, knowingly to engage and attempt to engage in monetary transactions, by, through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Wire Fraud, in violation of Title 18, United States Code, Section 1343; and Bank Fraud, in violation of Title 18, United States Code, Section 1344.

**All in violation of Title 18, United States Code, Section 1956(h).**

## FIRST FORFEITURE ALLEGATION
### (Wire Fraud and Conspiracy)

**The Grand Jury Alleges That:**

Upon conviction of the offenses alleged in Counts 1, 2 through 82, and 97 through 113 of this Superseding Indictment, or any one of them, the defendants, **ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN** and **MICHAEL TREMITI**, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction, including, but not limited to:

## MONETARY AMOUNT

The sum of two hundred sixty-seven million, three hundred forty-six thousand, six hundred eighty-nine dollars ($267,346,689) United States currency to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment amount will accrue at the prevailing rate per annum and serve as a judgment and lien against defendant's property, wherever situated until fully satisfied.

**REAL PROPERTY**

a.      The premises, buildings, appurtenances, improvements, and real property located at **215 Dorchester Avenue, Syracuse, New York, known as the Rugby Square Apartments,** a multi-family residential apartment complex, **owned by Rugby Square LLC**, and more particularly described in a certain deed recorded in the Onondaga County Clerk's Office on March 1, 2012 in Book 5191 at Page 569;

b.      The premises, buildings, appurtenances, improvements, and real property located at **221 and 291 William Street, Buffalo, New York**, **known as the Morgan Ellicott Apartments**, a multi-family residential apartment complex, **owned by Morgan Ellicott Apartments LLC**, situate in the County of Erie, and more particularly described in a certain deed recorded in the Erie County Clerk's Office on June 5, 2012 in Book 11224 of Deeds at Page 1836;

c.      The premises, buildings, appurtenances, improvements, and real property located at **86 East Amherst Street, Buffalo, New York**, **known as the Amherst Gardens Apartments**, a multi-family residential apartment complex, **owned by Chesed Properties Buffalo** LLC, situate in the County of Erie, and more particularly described in a certain deed recorded in the Erie County Clerk's Office on July 2, 2014 in Book 11266 of Deeds at Page 886;

d.      The premises, buildings, appurtenances, improvements, and real property at **597 Collins Street, Avon, New York**, **known as Avon Commons**, a multi-family residential apartment complex, **owned by Morgan Avon Apartments LLC**, situate in the County of Livingston, and more particularly described in a certain deed recorded in the Livingston County Clerk's Office on December 15, 2014 in Book 1273 of Deeds at Page 1788;

e.      The  premises, buildings, appurtenances, improvements, and real property at at **10100 Kettlecreek Drive, Cranberry Township, Pennsylvania**, **known as Rochester Village Apartments at Park Place,** a multi-family residential apartment complex, **owned by Park Place Pittsburgh,** LLC, situate in the County of Butler, Pennsylvania and more particularly described in a certain deed recorded in the Butler County Clerk's Office as instrument #201205110013496 in Plan Book Volume 329, Pages 13-16 (being a resubdivision of Parcel PP M1-M2 in the Park Place Subdivision Plan #2 Plan for recording, as recorded on August 26,2011, in the Recorder of Deeds Office of Butler County, Pennsylvania, as instrument #201108260020358);

f.      The premises, buildings, appurtenances, improvements, and real property at 1000 **Meadow Lane, Canonsburg, Pennsylvania**, **known as The Reserve at Southpointe**, a multi-family residential apartment complex, **owned by The Reserve at Southpointe** LLC, and further described as:

The certain parcel of land being all of Lot #1 in the Reserve at Southpointe Plan No 1, Last recorded in Instrument No. 201237840 in the Washington County Recorder

of Deeds Office: Said lands being situate in the township of Cecil, County of Washington, Commonwealth of Pennsylvania; Together with the rights and responsibilities contained in the Access Easement between The Reserve at Southpointe LLC, a Delaware limited liability company, The reserve at Southpointe II LLC, a Delaware limited liability company and RCM PA Land LLC, a Pennsylvania limited liability company, dated June 24, 2016 and recorded June 27, 2016 in the Washington County Recorder of Deeds Office as Instrument number 201615700.

g.      The premises, buildings, appurtenances, improvements, and real property at **9000 Old Station Road, Cranberry Township, Pennsylvania**, **known as Eden Square Apartments,** a multi-family residential apartment complex, **owned by Cranberry Vista Apartments LLC**, situate in the County of Butler, Pennsylvania, being known as Lot Number 2 in the Davis Subdivision Plan as recorded in the Recorder's Office of Butler County, Pennsylvania on January 10, 2014 in Plan Book Volume 339, page number 43 as Instrument # 201401100000776;

h.      The premises, buildings, appurtenances, improvements, and real property at **2000 Pebbleview Drive, Victor, New York, known as the Villas of Victor**, a multi-family residential apartment complex, **owned by The Villas of Victor LLC**, situate in the County of Ontario, and more particularly described in a certain deed recorded in the Ontario County Clerk's Office on October 24, 2002 in Book 1085 of Deeds at Page 944;

i.      The premises, buildings, appurtenances, improvements, and real property at **1700 Patrick Place, South Park Township, Pennsylvania, known as Park Place of South Park**, a multi-family residential apartment complex, **owned by Park Place of South Park Apartment Homes LLC**, and further described as:

A certain lot or piece of ground situate in the Township of South Park, County of Allegheny and Commonwealth of Pennsylvania being known and designated as Lot #6 in the Park Place Apartments Plan as recorded in the Department of Real Estate of Allegheny County, Pennsylvania in Plan Book Volume 95, Pages 154 to 156. Also known as Phase I, Park Place, a condominium development, as recorded in Plan Book Volume 115, pages 167 to 174, Phase II Park Place, a condominium development as recorded in Plan Book Volume 115, pages 175 to 182, and Phase III Park Place, a condominium development, as recorded in Plan Book Volume 115, pages 183 to 189.

j.      The premises, buildings, appurtenances, improvements, and real property at 1200-**A Penfield Road, Penfield, New York, known as Ellison Heights Apartments**, a multi-family residential apartment complex, **owned by Ellison Heights Apartments LLC**, situate in the County of Monroe, and more particularly described in a certain deed recorded in the Monroe County Clerk's Office on December 24, 2013 in Book 11343 of Deeds at Page 350;

      k.      The premises, buildings, appurtenances, improvements, and real property at **59 Union Square Boulevard, Chili, New York, known as Union Square Apartments**, a multi-family residential apartment complex, **owned by 59 Union LLC**, situate in the County of Monroe, and more particularly described in a certain deed recorded in the Monroe County Clerk's Office on October 31, 2017 in Book 11940 of Deeds at Page 614; and

      l.      The premises, buildings, appurtenances, improvements, and real property at **2227 Brickyard Road, Canandaigua, New York, the Links at Centerpointe Townhomes**, a multi-family residential apartment complex, **owned by Morgan Canandaigua Land LLC**, situate in the County of Ontario, and more particularly described in a certain deed recorded in the Ontario County Clerk's Office on December 16, 2013 in Book 1308 of Deeds at page 906.

      If any of the property described above, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;
      b.      has been transferred or sold to, or deposited with, a third party;
      c.      has been placed beyond the jurisdiction of the court;
      d.      has been substantially diminished in value; or
      e.      has been commingled with other property that cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the value of the above referenced properties pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

      **All pursuant to Title 18, United States Code, Sections 981(a)(1)(C), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).**

## SECOND FORFEITURE ALLEGATION
### (Bank Fraud, Wire Fraud and Conspiracy)

### The Grand Jury Further Alleges That:

Upon conviction of the offenses alleged in Counts 1 through 113 of this Indictment, or any one of them, the defendant, **ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN** and **MICHAEL TREMITI,** shall forfeit to the United States of America any property constituting, or derived from proceeds obtained directly or indirectly, as a result of such offense of conviction, including, but not limited to:

### MONETARY AMOUNT

The sum of two hundred sixty-seven million three hundred forty-six thousand six hundred eighty-nine dollars ($267,346,689) United States currency to be evidenced by a monetary judgment issued by this Court in aforesaid amount.  Said judgment amount will accrue at the prevailing rate per annum and serve as a judgment and lien against defendant's property, wherever situated until fully satisfied.

### REAL PROPERTY

All of the Real Properties listed in the First Forfeiture Allegation, above, incorporated herein by reference.

If any of the property described above, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;
b.   has been transferred or sold to, or deposited with, a third party;
c.   has been placed beyond the jurisdiction of the court;
d.   has been substantially diminished in value; or
e.   has been commingled with other property that cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the value of the above referenced properties pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

**All pursuant to Title 18, United States Code, Section 982(a)(2).**

### THIRD FORFEITURE ALLEGATION
### (Money Laundering Conspiracy)

**The Grand Jury Alleges That:**

Upon conviction of the offense alleged in Count 114, the defendants, **ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN** and **MICHAEL TREMITI**, shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.  The property to be forfeited includes, but is not limited to, the following:

### MONETARY AMOUNT

The sum of two hundred sixty-seven million three hundred forty-six thousand six hundred eighty-nine dollars ($267,346,689.00) United States currency to be evidenced by a monetary judgment issued by this Court in aforesaid amount.  Said judgment amount will accrue at the prevailing rate per annum and serve as a judgment and lien against defendant's property, wherever situated until fully satisfied.

### REAL PROPERTY

All of the Real Properties listed in the First Forfeiture Allegation, above, incorporated herein by reference.

If any of the property described above, because of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the value of the above referenced properties.  The United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

**All pursuant to Title 18, United States Code, Section 982(a)(1).**

**DATED**:  Buffalo, New York, May 21, 2019.

JAMES P. KENNEDY, JR.
United States Attorney

BY:   S/JOHN D. FABIAN
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5819
john.fabian@usdoj.gov

A TRUE BILL:

S/FOREPERSON