**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                           :

UNITED STATES OF AMERICA,    :

                           :

v.                           :

                           :

ROBERT C. MORGAN, et al.    :    18-CR-108-EAW

                           :

              *Defendants.*    :

                           :

                           :
-----------------------------------------------------------x

### ROBERT MORGAN'S POST-EVIDENTIARY HEARING MEMORANDUM IN FURTHER SUPPORT OF HIS MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR VIOLATION OF THE SPEEDY TRIAL ACT AND VIOLATION OF MR. MORGAN'S RIGHT TO A SPEEDY TRIAL

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     STANDARD ................................................................................................. 4

III.    STATEMENT OF FACTS ............................................................................ 5

        A.      Data Collection and Processing by the Government ................................. 5

        B.      The Court-Ordered Protocol ................................................................ 7

        C.      The Conditional Exclusion of Speedy Trial Act Time .......................... 8

        D.      August Production ............................................................................ 9

        E.      Laptop Production ........................................................................... 11

IV.     DEFENDANTS HAVE ESTABLISHED REPEATED FAILURES BY THE
        GOVERNMENT TO COMPLY WITH THE PROTOCOL'S REQUIREMENTS ........ 13

        A.      It Is Undisputed that the Government Violated the Protocol by Failing to
                Provide Required Metadata in the Formats Mandated by the Protocol. ............. 13

        B.      It Is Indisputable that the Government Violated the Protocol by Failing to
                Provide Native Files. ........................................................................ 15

        C.      It Is Undisputed that the Government Violated the Protocol When It Failed
                to Provide a Load File for 60% of the Documents in the August
                Production. ....................................................................................... 16

        D.      Defendants Demonstrated Additional Failures by the Government to
                Comply with the Protocol's Metadata Requirements. .......................... 17

V.      THE GOVERNMENT CANNOT AND DID NOT SHOW THAT ITS
        FAILURES TO COMPLY WITH THE PROTOCOL WERE EXCUSABLE. .............. 21

        A.      The Government Has Not Shown that Its Failure to Provide Metadata and
                Native Files Required by the Protocol Was Excusable. ....................... 21

        B.      The Government's Failure to Provide Metadata Required by the Protocol
                Significantly Impeded Mr. Morgan's Ability to Make Use of the
                Productions. ..................................................................................... 25

VI.     CONCLUSION ............................................................................................ 28

## I.        PRELIMINARY STATEMENT

Robert Morgan has argued for nearly seven months that the government's abject, ongoing failures to comply with its court-ordered discovery obligations, and its pattern of misrepresentations regarding those failures, requires dismissal with prejudice of the superseding indictment.  *See* Dkt. 217 at 19-23, 25-26.  The evidence proffered and testimony elicited at last month's evidentiary hearing (the "Hearing") on the government's noncompliance with the agreed-upon, court-ordered protocol governing document productions in this matter (see Dkt. 27-1, the "Protocol") reinforced what Mr. Morgan has long asserted.   In fact, it revealed that the government's noncompliance with the Protocol was even more widespread than previously understood, that the government knew this to be so, that it took no (or, at best, woefully insufficient) action to remediate its failures, and that it then misled the Court and Defendants about those failures.  It was clear even before the Hearing that the government violated the Speedy Trial Act when it failed to comply with Magistrate Judge Schroeder's Rule 16 disclosure deadline of July 31, 2019, that this violation required dismissal of the superseding indictment, and that the government's misconduct and pattern of neglect further supported doing so with prejudice. Evidence and testimony at the Hearing not only confirmed each of those previously proven points, but also demonstrated *how* and *why* the government's failures to comply with its obligations under the court-ordered Protocol have continuously impeded Mr. Morgan from adequately preparing his defense.  Dismissal with prejudice is the only appropriate remedy to deter such misconduct by the government.

In the year that has passed since the July 31, 2019 deadline for the government to produce *all* discovery in its possession, the government has proffered a series of ever-changing excuses for its failures to meet that deadline and to comply with the court-ordered Protocol.  The Hearing

exposed those excuses for what they are: baseless, *post-hoc* efforts to cover up a litany of failures to comply with court orders.

The Court is well aware that the government's productions to date have been riddled with deficiencies and omissions.  Although that much was clear before the Hearing, it is now indisputable that the government repeatedly, and in some cases *knowingly*, violated the court-ordered Protocol in multiple ways.  In fact, the government's own in-house discovery specialist—whom Defendants had to call as a witness over the government's initial objection—*conceded* under oath at the Hearing that both the August Production *and* the Laptop Production[1] did not comply with several of the Protocol's explicit requirements.  That alone is enough to carry Defendants' burden to show noncompliance by a preponderance of the evidence.  Moreover, documentary and testimonial evidence at the Hearing debunked the government's many unsubstantiated excuses for its noncompliance.  It is now clear that the government failed not only to comply with the Protocol, but also to undertake a meaningful analysis to understand *why* those failures occurred or what it could do to resolve them.  Instead, it misled the Court and Defendants.

In the wake of the Hearing, the following facts are uncontroverted:

- **The government violated the Protocol by producing misformatted and unusable date sent metadata, and by failing to produce file size metadata, for hundreds of thousands of documents in the August Production.**  Indeed, the government *conceded* at the Hearing—*for the first time*—that it failed to catch, let alone correct, these deficiencies during whatever limited "quality control" review it conducted on the August Production. *See* Vol. III Tr. 490:22-492:19, 534:23-538:18 (Bowman).

- **The government violated the Protocol by failing to provide the required custodian information for approximately 800,000 documents in the August Production.**  The government *conceded* at the Hearing that the Protocol required it to enter custodian information manually and that its failure to provide Defendants with that information was therefore human error, not a metadata issue.  *See* Vol. III Tr. 553:10-19 (Bowman); Ex. RM 6.

---

[1]    The parties have agreed upon the meaning of these and other defined terms per the stipulation dated August 14, 2020.  Dkt. 436.

- **Moreover, the government's discovery specialist revealed *for the first time* at the Hearing that the supervising prosecutors *specifically instructed* him to *withhold* custodian information for *all* of the documents in the Laptop Production.** *See* Vol. III Tr. 552:14-553:19 (Bowman).  This stunning admission provides illuminating context for the government's previous position—directly contradicted by the plain text of the Protocol—that it was not "required to input information into the Custodian metadata field." Dkt. 192; *see also* Dkt. 197 at 2; Dkt. 228 (Jan. 27, 2020 Hr'g Tr.) at 26:2-29:10.

- **In violation of the Protocol, the government failed to produce—and, indeed, still has not produced—more than 23,000 native files for documents contained in the August Production.**  Ex. RM 7.

- **Relatedly, the government disclosed at the Hearing that many of the "native" files it *did* produce were not actually produced "in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business," as required by the Protocol.** Dkt. 27-1, at 1.  Rather, they are "near native" documents the government extracted from the native "container files" (which the government withheld from the Defendants).  *See* Vol. V Tr. 633:13-634:4, 679:12-680:7 (Marchese).

- **After entering into the Protocol in December 2018, the government failed to reprocess documents it then produced in the August Production—and failed to identify that many of those documents (which it had previously produced to other Defendants) did not contain all metadata required by the Protocol.**  *See* Vol. III Tr. 464:13-465:16 (Bowman).

- **The government did not tell Defendants (or the Court) until recently that three different government entities processed the documents comprising the August Production across multiple platforms using different settings, resulting in inconsistencies across metadata fields.**  *See* Marchese Tr. 14:3-7, 67:11-68:12; Vol. III Tr. 469:5-470:21 (Bowman).

- **The government's primary processing software program *could* have extracted some of the metadata that the government was required to produce per the Protocol, notwithstanding the government's prior, repeated misrepresentations to the contrary.** *Compare* Vol. III Tr. 564:21-565:21 (Martin), *and* Ex. R, *and* Vol. III Tr. 561:18-562:2 (Bowman), *and* Marchese Tr. 68:14-21, *and* Vol. III  Tr. 535 (Bowman), *with* Dkt. 197 at 2, *and* Dkt. 282 (Mar. 10, 2020 Hr'g Tr.) at 77:2-78:25.

- **The government has made inaccurate representations to the Court and Defendants regarding its failures to comply with the Protocol, including by overstating purported explanations for those failures, withholding crucial facts, and inappropriately attempting to shift blame to Defendants.**  *See* Vol. V. Tr. 638:6-639:8 (Marchese); *compare* Marchese Tr. 61:2-62:23, *with* 228 (Jan. 27, 2020 Hr'g Tr) at 11:5-13:25, *and* Dkt. 282 (Mar. 10, 2020 Hr'g Tr.) at 55:10-58:5.

- **The government's failures have had a significant impact on Mr. Morgan's ability to adequately prepare for trial.**  *See, e.g.*, Marchese Tr. 110:7-16; *see also* Vol. II Tr. 202:6-15 (Hyde).

These unrefuted facts, and other evidence presented at the Hearing, show gross negligence (at best) or intentional misconduct (at worst) on the part of the government. Under these circumstances, dismissal of the superseding indictment with prejudice is warranted.

## II.  STANDARD

The Court ordered the Hearing in aid of reaching a decision on Mr. Morgan's pending Motion to Dismiss the Superseding Indictment for Violation of the Speedy Trial Act and Violation of Mr. Morgan's Right to a Speedy Trial (*see* Dkt. 216).[2]

The Court limited the scope of the Hearing to whether the government's August Production complied with the agreed-upon and court-ordered Protocol (*see* Dkt. 27-1; Ex. A), and indicated that this question would bear on whether a dismissal of the superseding indictment would be with or without prejudice. *See* Dkt. 282 (Mar. 10, 2020 Hr'g Tr.) at 11:8-24; 12:15-16. However, the Court permitted Defendants to "present evidence that the [Laptop Production] was also not compliant with the [Protocol], because this would go to whether there's been a pattern on the part of the government in failing to comply with the [Protocol]." *Id.* at 11:18-24.

The Court set forth a burden-shifting framework to govern the Hearing, placing the initial burden on Defendants to prove by a preponderance of the evidence that the government failed to comply with the Protocol in the August Production. *Id.* at 11:15-18. Upon such a showing, the burden then would shift to the government to prove, also by a preponderance of the evidence, that its "reasons for the lack of compliance with the . . . [P]rotocol . . . were excusable and not a pattern of neglect." *Id.* at 12:7-14.

---

[2]   The legal standard relevant to, and Mr. Morgan's arguments in support of, the motion to dismiss are included in Mr. Morgan's opening and reply briefs on that motion. *See* Dkt. 217 (opening brief); Dkt. 279 (reply brief). Mr. Morgan hereby incorporates the arguments set forth in those briefs as if they were fully restated herein. Furthermore, Mr. Morgan hereby joins in the arguments made by all of his co-defendants, *see, e.g.*, Dkt. 435, to the extent those arguments relate to Mr. Morgan.

### III.   STATEMENT OF FACTS

####   A.   Data Collection and Processing by the Government

In May 2018, the government executed a search warrant at the offices of Morgan Management, from which it collected data from two servers and several computers. *See* Dkt. 217 at 8. At the Hearing, the government presented no witnesses with *any* direct knowledge of the search, seizure, or data collection processes. Instead, over the government's initial objection, it was *Defendants* who called the government's in-house eDiscovery specialist, Craig Bowman, to testify under oath at the Hearing.[3] Mr. Bowman testified that he never spoke to the agents responsible for gathering the data about the collection process, and that he could not identify the individuals involved. *See* Vol. III Tr. 410:11-412:2 (Bowman); *see also id.* at Tr. 406:17-23 (Bowman clarifying that his so-called "research"—which he previously represented to the Court showed that "when the agents extracted the data out, they extracted directly as [the data] existed," Dkt. 182 (Dec. 20, 2019 Hr'g Tr.) at 10:8-10—in fact consisted only of looking at processed documents in the government's database and not speaking to anyone with actual knowledge of what happened).

Further, Mr. Bowman testified at the Hearing that the devices seized pursuant to the search warrant were processed (eventually, over many months) by three different agencies, using two different processing platforms, each with different settings:

*First*, Mr. Bowman testified that sometime after the search (May 2018) but before the Protocol was negotiated and filed on the docket per order of the Court (December 2018), he

---

[3]   Notably, the government had previously proffered Mr. Bowman as an unsworn percipient witness in numerous court conferences regarding eDiscovery matters in this case, yet at first opposed his even being called by Defendants and later declined to call him at the Hearing. Of course, Mr. Bowman continued to consult with the prosecutors and the government's paid expert throughout the Hearing. *See* Vol. II Tr. 318:13-319:8 (Bowman). And, as the Court itself observed, Mr. Bowman repeatedly looked to the prosecutors sitting at counsel table before answering Defendants' questions during his testimony. *See* Vol. II Tr. 439:23-440:13.

processed the two seized servers using a processing platform called Nuix, and that he used the "basic settings" or "standard template for processing."  Vol. II Tr. 326-330 (Bowman); Vol. III Tr. 496:5-25 (Bowman).  He acknowledged that Nuix's processing settings can be adjusted and are user-dependent.  *See* Vol. III Tr. 527:19-25 (Bowman) ("You tell Nuix how you want to export them out.  You can export them out in several different formats."); *id.* at Tr. 561:22-25 ("[Y]ou chose what fields you want [to export].").

*Second*, Mr. Bowman testified that, around the same time in 2018, eDiscovery personnel at the Litigation Technology Service Center ("LTSC") processed some (but not all) of the seized computers using a different processing platform, called Venio.  *See* Vol. II Tr. 343:5-7 (Bowman).  Mr. Bowman said that LTSC used Venio (not Nuix) in order to meet the deadline Mr. Bowman had given them.  *See id.* at Tr. 343:6-14 (Bowman); Vol. III Tr. 469:13-470:21 (Bowman).  Although the government acknowledged that processing on different platforms could cause metadata discrepancies, *see* Marchese Tr. 14:5-11; 67:11-68:12, Mr. Bowman testified that he did not raise any such concerns contemporaneously upon learning that LTSC planned to use a different platform than the one that he had previously used to process other data seized during the May 2018 search.  *See* Vol. III Tr. 470:2-21 (Bowman).

*Third*, Mr. Bowman said that, more than a year later (in late 2019), agents from the Federal Housing Finance Agency ("FHFA") processed three additional computers that had been seized in the May 2018 search—specifically, the three computers whose data collectively comprises the belatedly-produced Laptop Production.  *See* Vol. II Tr. 341:16-342:19 (Bowman).  According to Mr. Bowman, the FHFA agents used a "faster" version of Nuix than he had when processing the two servers in 2018.  *Id.*  Mr. Bowman said he provided a copy of the Protocol to the FHFA agents, and told them "this is how they want it processed," but that he did not otherwise discuss the Protocol with them.  *Id.* at Tr. 344:15-345:18.

B.        **The Court-Ordered Protocol**

In October 2018, in response to a series of missed discovery deadlines and metadata deficiencies in the government's Pre-Protocol Production (including with respect to data from the devices processed by Mr. Bowman and LTSC), Magistrate Judge Schroeder ordered the parties—a group that did not include Mr. Morgan at that time—to negotiate and implement a document production protocol. *See* Dkt. 184 (Oct. 31, 2018 Hr'g Tr.) at 29:8-30:9; Dkt. 217 at 9.

Prosecutors and other personnel from the government, including Mr. Bowman, circulated drafts of, and negotiated specific revisions to, the Protocol. *See* Vol. II  Tr. 345-347 (Bowman); *see also* Vol. III Tr. 454:21-465:22 (the government and defense both modified the initial draft protocol and Mr. Bowman personally made edits).  For example, the government sought (and obtained) agreement from the defense regarding the format in which certain "date" metadata should be produced, apparently at the behest of its vendor. *See* Vol. III Tr. 456:10-22 (Bowman).

As noted *supra*, the government had already processed the data that comprised the August Production at the time it negotiated and agreed to the Protocol in December 2018.  And yet, although the government knew (or should have known) about any nuances or limitations of its processing software, and the settings it previously applied during processing, the government said nothing during negotiations over the Protocol about those limitations and failed to raise any concerns regarding the purported inability of its processing software to extract the metadata required by the Protocol. *See id.* at Tr. 514:5-515:1 (Bowman).

The parties ultimately agreed to the Protocol and filed it on the Court's docket, per order of Magistrate Judge Schroeder. *See* Vol. II Tr. 346:18-23 (Bowman); Dkt. 27-1.  Since December 2018, then, the government has been obligated by the Court to follow the "technical requirements" of the Protocol—which, of course, the government itself negotiated and agreed to—in its productions to Defendants.  Dkt. 27-1; *see also* Vol. II Tr. 346:24-347:22 (Bowman).

The Protocol governs both the extraction and the production of documents. Except for "circumstances beyond the producing party's control such as a corrupted or encrypted file," the Protocol *requires* the producing party to transmit a load file containing all metadata information that the processing software is "able to extract" in a format consistent with Addendum A. Dkt. 27-1 at 2-3, *id.* at 4 Add. A ("The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below.").[4] The Protocol also mandates the production of files "in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business." Dkt. 27-1 at 1-2; *see also* Section IV(B), *infra*.

## C.     The Conditional Exclusion of Speedy Trial Act Time

Mr. Morgan was indicted in this matter in May 2019. The following week, the government asked Magistrate Judge Schroeder for a 60-day extension of its discovery deadline, noting "that is the timeline [requested by] the vendor who will be processing the data in the protocol" and expressing confidence that it "will be able to . . . provide all discovery in the government's possession within the 60 days and in accordance with the protocols." Dkt. 53 (May 29, 2019 Hr'g Tr.) at 9:16-20. Magistrate Judge Schroeder expressed grave concerns about the government's inability to meet previous deadlines, including deadlines set forth when he initially ordered the parties to negotiate and implement the Protocol, *id.* at 7:12-8:19, and granted the government's request for the 60-day extension but noted that the speedy trial clock would run if the government failed to timely produce discovery "which is in the government's possession, which is being put together pursuant to a protocol," *id.* at 15:19-21; *see also* Dkt. 217 at 10-12. The government's deadline for this production was July 31, 2019. Dkt. 53 (May 29, 2019 Hr'g Tr.) at 17:16-18.

---

[4]     For a discussion of the practical importance of relevant metadata fields (which is pertinent only to the government's burden for the Hearing), *see infra*, Section V(B).

### D.    August Production

The government made its first production of documents to Mr. Morgan on August 8, 2019 (the "August Production").  The government stated in a cover letter accompanying that production that it was providing the documents "in industry-standard load files for document review systems" and that the "format of the production comports with the agreed-upon protocol filed with the Court."  Ex. RM 8 (Dkt. 157-1 at 70).

The August Production was comprised of several smaller productions, one of which was missing a load file.  Dkt. 138-4 at ¶ 10.  The Protocol requires the producing party to provide "data load file[s]."  Dkt. 27-1 at 1; Vol. II Tr. 198:22-199:25 (Hyde).  Load files are required for good reason: as even the government has acknowledged, "load[ing] . . . discovery into a document review platform . . . *cannot be done* without working load files."  Dkt. 143 at 6 (emphasis added); *see also* Vol. II Tr. 206:17-24 (Hyde).  Here, the missing load file accounted for more than 886,500 documents—or *60% of all documents* included in the August Production.  *See* Vol. II Tr. 204:17-206:12 (Hyde); Ex. RM 8; *see also* Dkt. 138-4 at ¶ 10.  Mr. Morgan eventually received the missing load file on November 5, 2019, but only after he raised this issue to the government.

Upon receiving the load file, counsel for Mr. Morgan was further delayed in uploading the August Production by a number of government errors, including documents for which the date information and file sizes were provided in a format that was both noncompliant with the Protocol and unreadable by Relativity (the review platform used by Mr. Morgan's counsel).  *See* Vol. II Tr. 193:7-11 (Hyde); *id.* at 208:24-25; Dkt. 157 at 3-4 (detailing date and file size deficiencies for hundreds of thousands of documents in the August Production).

Counsel for Mr. Morgan soon identified additional deficiencies in the August Production. For example, quality control searches revealed that nearly 600,000 documents were missing file extensions, as required by the Protocol.  *See* Dkt. 157 at 3; Vol. II Tr. 193:14-17 (Hyde).  On

December 9, 2019, in an effort to facilitate the government's remediation of its failures, counsel for Mr. Morgan provided the government with logs that specifically identified more than 744,000 documents in the August Production with metadata deficiencies.  *See* Dkt. 182 (Dec. 20, 2019 Hr'g Tr.) at 7:15-17.

The government eventually (on December 17, 2019) provided an overlay file for the purpose of correcting the misformatted dates and file sizes; with respect to file extensions, however, it asserted—erroneously, we know now—that it could not provide an overlay because file extension information was "missing in the underlying documents."  Dkt. 162-1 at 5-6, ¶¶ 14-16; *see also* Dkt. 182 (Dec. 20, 2019 Hr'g Tr.) at 9:24-10:20 (government representing to the Court that certain files "never had an extension" and thus that certain file extension metadata "doesn't exist").

As a result of the Hearing, we know now that the government made no efforts to actually process and produce the electronic data as required by the Protocol.  As discussed above, the August Production included documents from devices and servers that were processed by Mr. Bowman and LTSC *before* the Protocol was in place in late 2018.  Mr. Bowman conceded under oath at the Hearing that the noncompliant formatting of date and file size metadata was a product of the settings the government applied in Nuix during its initial (and only) processing in 2018, and that the government failed to notice the error before making the production in August 2019.  *See* Vol. III Tr. 535:6-536:11 (Bowman).

 Yet once the Protocol was agreed-upon and entered on the Court's docket in December 2018, the government undertook no efforts to reprocess that material, and thus did not attempt to extract metadata required by the Protocol that may not have been extracted or produced previously under the processing settings originally applied by Mr. Bowman and LTSC in 2018.  *See id.* at Tr. 464:13-465:18; 489:15-490:2 (Mr. Bowman conceded that it never occurred to him to reprocess

the metadata before the August Production, or even once metadata issues were brought to his attention); *compare id.* at Tr. 346:2-4 (acknowledging the Protocol was not "standard" and contained an "unusual" field), *with id.* at Tr. 330:5 (the government processed data using its "standard template for processing").

As discussed in greater detail *infra*, further analysis of the August Production over the past year, and in preparation for the Hearing, revealed pervasive violations of the Protocol by the government—and that many of these violations remain uncorrected to this day.

###    E.    Laptop Production

In December 2019, the government made a new production to Defendants, which purportedly consisted of documents from three computers seized during the May 2018 search and then processed 18 months later by FHFA (the "Laptop Production").  The government has, of course, acknowledged that the Laptop Production came long after the court-ordered July 31, 2019 discovery deadline. *See, e.g.*, Dkt. 264 at 11 ("[T]he production of Rule 16 material after July 31, 2019, is uncontested."); Vol. III Tr. 420:15-23 (the Court noting that the government's failure to comply with the discovery deadline in providing the Laptop Production is "not a disputed fact"). And this untimely production, too, was riddled with metadata deficiencies.

Within weeks of receiving the Laptop Production, counsel for Mr. Morgan identified myriad issues with the documents therein and provided the government with a log listing those documents and their many deficiencies.  Dkt. 174 at 1.  Among other errors, the Laptop Production contained 624 email messages that lacked date sent metadata, nearly 644,000 documents missing MD5 Hash values, more than 717,000 documents lacking file size metadata, and nearly 777,000 documents lacking file extension information.  *Id.*  Moreover, the government failed to include custodian information in the proper field for *any* of the documents in the Laptop Production.  *Id.* All of these errors violated the requirements of the Protocol.

Shortly thereafter, the government provided an overlay file that corrected only a small number of the issues that counsel for Mr. Morgan had identified regarding the Laptop Production: specifically, it provided MD5 Hash values for only 56 of the nearly 644,000 documents that previously had been missing such values. *See* Dkt. 195 at 1. The government disclosed for the first time at the Hearing that it had failed to produce MD5 Hash values for the remaining hundreds of thousands of documents because the FHFA agents who processed the source data applied a setting that apparently prevented the processing software from creating MD5 Hash values for large documents. *See* Vol. III  Tr. 534:10-19 (Bowman).

The breadth of the government's discovery failures in this case is astounding. But it is the government's *deliberate and intentional* failure to produce properly formatted custodian information in connection with the Laptop Production that is in many ways the most appalling. The government long ago acknowledged that it did not include custodian information in the custodian field for *any* of the documents in the Laptop Production (despite having done just that for many documents in the August Production). *See* Dkt. 197 at 2. Instead, it "maintain[ed] that it was not required to input custodian data in a specific metadata field," *id.* at 2, and that "[t]here [wa]s no functional difference between" what it provided—that is, a "chart . . . list[ing] each of the devices seized . . . and match[ing] it with an evidence control number contained in the File Path metadata field[, which] allows defense counsel to search, sort, filter, etc. based on the custodian of the seized device"—and "providing it in the Custodian metadata field." Dkt. 192 at 2. Of course, the government's preposterous suggestion is directly contrary to the language in the Protocol, which explicitly requires custodian information to be provided in the "CUSTODIAN" metadata field. *See* Dkt. 27-1 at Add. A. Moreover, even the government acknowledged that its unnecessary and convoluted proposed procedure "require[d] one extra step in translating the evidence control number to the custodian name," Dkt. 192 at 2, and, under questioning from the Court on January

12

27, 2020, eventually agreed that it was unreasonable for it to have provided custodian information in a different format and metadata field in the context of the Laptop Production than it had previously for the August Production, *see* Dkt. 228 (Jan. 27, 2020 Hr'g Tr.) at 28:11-29:10 (the Court noting that "the government through a very simple process can just provide the custodian information, but [didn't] do it").  As if to prove the Court's point regarding this elementary and entirely avoidable failure, the government provided an overlay file to correct the missing custodian information for *all* documents in the Laptop Production just *one day* after the January 27, 2020 status conference.  *See* Dkt. 271-2 at 1, ¶ 4.

The Court has known of this issue for months.  But what the Court and Defendants learned *for the first time* at the Hearing is that the prosecutors affirmatively *directed* Mr. Bowman to *withhold custodian information* from the appropriate metadata field in the context of the Laptop Production.  *See* Vol. III Tr. 552:14-553:19 ("The Court: You were told by the AUSAs to leave "custodian" blank?  A: Yes. . . The Court: But would you agree the document production Protocol required a field for custodian?  A: I do agree, yes.").  The government made no attempt at the Hearing to refute or walk back this sworn testimony from Mr. Bowman.

## IV.   DEFENDANTS HAVE ESTABLISHED REPEATED FAILURES BY THE GOVERNMENT TO COMPLY WITH THE PROTOCOL'S REQUIREMENTS.

### A.   It Is Undisputed that the Government Violated the Protocol by Failing to Provide Required Metadata in the Formats Mandated by the Protocol.

The government conceded at the Hearing that the August Production violated the Protocol in several ways, impacting hundreds of thousands of documents.  These concessions are uncontroverted evidence that the government failed to comply with the Protocol, and are more than sufficient to satisfy Defendants' preponderance burden at the Hearing:

*First*, the government acknowledged that it failed to provide date sent metadata in the format required by the Protocol—a format that the government itself requested pursuant to the

wishes of its vendor, as described above.  The government admitted for the first time at the Hearing that this error was a result of its own processing settings and that it "missed" the improperly formatted dates during whatever limited quality control it may have conducted on the August Production.  Vol. III  Tr. 535:1-3, 17-22 (Bowman) ("To be honest, my team missed it when we were looking at it.  We didn't realize, because a million plus records, it was near the bottom, and we didn't see it . . . unfortunately, during the quality control check, that was missed.").  Mr. Bowman also acknowledged that the government *could* have produced properly formatted date sent metadata if it had tried to do so.  *See* Vol. III Tr. 510:1-2 ("[W]hen you export it out, you can format the date however you want.").

*Second*, the government similarly acknowledged that it failed to provide file size metadata in the format required by the Protocol, and that this error too was the result of processing the data before the date of the Protocol and was not caught during quality control.  *See* Vol. III Tr. 535:23-536:11 (Bowman) (admitting that the government provided certain file sizes in bytes—instead of kilobytes, as required by the Protocol, *see* Dkt. 27-1 at 4 (Add. A)—and that these incorrect file sizes were (i) a vestige of the "initial settings" that the government applied during processing, *i.e.*, before entering into the Protocol, and (ii) not corrected to match the format required by the Protocol before being included in the August Production).

*Third*, the government conceded that the Protocol required it manually to include custodian information in the "CUSTODIAN" field, *see* Vol. III Tr. 553:10-19 (Bowman), and did not dispute that custodian information was (i) missing for over 750,000 documents in the August Production, and (ii) populated with an alphanumeric value that was noncompliant and meaningless to Defendants for an additional 48,000 documents in the August Production, *see* Ex. RM 6; Vol. II Tr. 248:19-250:18 (Hyde).  With respect to both, the government violated the Protocol and, in so doing, impeded Defendants' ability to review the documents.

*Fourth*, the government proffered a paid, professional witness, Kenneth Marchese, who conceded that, in at least some instances, the government failed to extract and produce date sent metadata that was available in the documents it produced as native files.  *See* Vol. V Tr. 635:18-20 (Marchese) (discussing an illustrative example in Exhibit R, Mr. Marchese noted that "[i]t had a good date value in it, but that value wasn't shown in the DAT file. It wasn't extracted, that particular message").

In each case, the government conceded not only that documents in the August Production were missing metadata required by the Protocol, but also that *its own errors* in processing the documents and/or preparing the production caused the omission, and therefore were not due to "circumstances beyond the [government's] control."  *See* Dkt. 27-1 at 1.  Thus, the government cannot credibly dispute that Defendants have met their burden to show by a preponderance of the evidence that the August Production failed to comply with the Protocol.

**B.    It Is Indisputable that the Government Violated the Protocol by Failing to Provide Native Files.**

Robert Hyde, the Gibson Dunn eDiscovery specialist assigned to this case, testified at the Hearing that the government failed to provide native files for more than 23,000 documents in the August Production.  *See* Ex. RM 7.  The government did not refute Mr. Hyde's testimony to that effect, or that its failure to provide native files was a violation of the Protocol's explicit requirements.  *See* Dkt. 27-1 at 1 ("Electronic files *will be produced* in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business." (emphasis added)); *see also id.* at 2 ("Copies of original email and native file documents/attachments *must be included* for all electronic productions." (emphasis added)).[5]

---

[5]    The Protocol provides that native files will not be produced if they are infected with a virus, *see* Dkt. 27-1 at 1, but the government offered no evidence that it withheld native files because of viruses.

The government conceded for the first time at the Hearing that, for a substantial number of documents originally stored in large container files, it produced "near-natives,"[6] instead of native files in "the format in which they are ordinarily used and maintained" as required by the Protocol. *See* Marchese Tr. 52:16-24 ("What the government processed were the source OST and PST files, and this is what was derived from the production and delivered to [Defendants]."); Vol. V Tr. 668:23-669:4 (Marchese) ("Q: [W]hen all of the e-mails were produced here as 'natives,' they were produced with a dot EML or a dot MSG file extension, were they not? A: That's correct. It's assigned by the file system they are saved in.").  The government's professional witness even *conceded* that the production of "near natives" was not contemplated in the Protocol.  *See* Vol. V Tr. 679:12-18 (Marchese) (agreeing that the Protocol does not provide for production of "near native" files or "derivative native" files).

The government admitted, as a corollary, that it failed to produce the original native container files (*i.e.*, .OST and/or .PST files), *see* Vol. III Tr. 528:9-21 (Bowman), which was a fact the government had not previously disclosed to the Court or Defendants, and that it failed to mention during negotiations regarding the Protocol, or when it subsequently made productions.  *See id.* at Tr. 514:5-23.

### C.     It Is Undisputed that the Government Violated the Protocol When It Failed to Provide a Load File for 60% of the Documents in the August Production.

The government did not dispute at the Hearing—and, indeed, has never disputed—that it failed to provide a load file for a substantial majority of the documents in the August Production. *See* Ex. RM 8.  The government's focus on the short delay in providing the missing load file to

---

[6]     The government referred to these "near native" files by several different names during the Hearing, including "natives," "near natives," and "derived natives."  *See*, *e.g.*, Vol. III Tr. 512:20-25 (Bowman) ("derived natives"); Vol. V Tr. 633:18-25 (Marchese) (saying that he was using the term "near natives" to "describe the EML files that were derived from the native files").

Mr. Morgan after he requested it is unavailing—it does not change the fact that the government

failed to timely provide the load file in the first place, in clear violation of the Protocol.

> **D.** **Defendants Demonstrated Additional Failures by the Government to Comply with the Protocol's Metadata Requirements.**

The aforementioned, undisputed deficiencies are more than sufficient, standing alone, to

establish by a preponderance of the evidence that the August Production did not comply with the

Protocol.  But Defendants' eDiscovery experts conducted analyses that revealed, and testified

regarding, yet more deficiencies that further demonstrate the pervasiveness of the government's

failures in this case.

Mr. Hyde is an experienced and knowledgeable percipient witness who has managed all

productions received from the government on behalf of Mr. Morgan.  Mr. Hyde testified at length

at the Hearing regarding not only his analysis of (and understanding of the causes for) the

deficiencies in the government's productions, but also the many issues he encountered in

processing and uploading the documents in those productions.  *See, e.g.*, Vol. II Tr. 190:24-192:10

(Hyde) (describing his involvement in receiving productions in this matter).

In preparation for the Hearing and to aid the Court, Mr. Hyde conducted a two-part analysis

of the government's productions:

*First*, he ran searches for documents that were missing values in certain metadata fields

required by the Protocol and subsequently exported reports listing the records for which metadata

was missing.  *See id.* at Tr. 193:18-24 (Hyde); *see also* Exs. RM 1-8, 10.  Ultimately, Mr. Hyde

reached several conclusions regarding missing or noncompliant metadata in the August

Production, including:

- More than 825,000 emails were missing date sent metadata required by the Protocol, and overlay files provided by the government many months after the July 31, 2019 discovery deadline corrected the issue for only approximately 270,000 of these 825,000 emails.  *See id.* Tr. 213:5-17; Ex. RM 1; *see also* Ex. RM 10 (exemplar email missing extractable date

sent information).  By comparison, only a small fraction of the emails produced as part of the Laptop Production were missing date sent metadata.  *See* Ex. RM 1.

- More than 750,000 documents lacked custodian information altogether, and an additional 48,000 documents contained a useless and noncompliant alphanumeric value in the custodian field.  *See* Ex. RM 6; Vol. II Tr. 250:14-251:21 (Hyde).

- Nearly 900,000 records were missing file extensions, and none were corrected by subsequent overlays.  *See* Ex. RM 2; Vol. II Tr. 224:6-225:19 (Hyde).

- More than one million records were lacking file size metadata, and none were corrected by subsequent overlays.  *See* Ex. RM 3; Vol. II Tr. 234:2-11 (Hyde).

- More than 1,200 documents were missing file names.  *See* Ex. RM 4; Vol. II Tr. 239:6-12 (Hyde).

- Nearly 84,000 documents were missing MD5 Hash values, and none were corrected by subsequent overlays.  *See* Ex. RM 5; Vol. II Tr. 244:5-17 (Hyde).

*Second*, Mr. Hyde reprocessed *all* "native" files that the government included in the August Production[7] in a new Relativity database, in an effort to determine whether the native files provided by the government contained extractable metadata that was not included in the load files provided by the government.[8]  *See* Vol. II Tr. 193:24-194:20 (Hyde); *see also* Exs. RM 1-7, 10-11.  Mr. Hyde testified that reprocessing the native files was a costly and unusual exercise.  *See* Vol. II Tr. 195:7-196:12, 254-255 (Hyde); *see also* Vol. III Tr. 506:24-507:1 (Bowman) (conceding that processing a production containing more than one million records could take as long as two weeks).

After generating reports from the new database containing reprocessed documents, Mr. Hyde compared those reports to the production as-received from the government to better

---

[7]    This would have included the files variously described by the government as "near natives" and/or "derived natives," as discussed herein. *See, e.g.*, Section V(A), *infra*.

[8]    Notably, the government did not provide natives (or documents it called natives) for over 23,000 records in the August Production. Ex. RM 7; Vol. II Tr. 209:2-211:7 (Hyde).  Thus, Mr. Hyde could not get a full picture to analyze the entire August Production.

understand the scope of, and cause for, the deficiencies therein.[9]  Upon reprocessing the native files, Mr. Hyde was able to extract (i) date sent values for all but 0.2% of the hundreds of thousands of emails in the August Production for which the government did not provide such values, *see* Ex. RM 1; Vol. II Tr. 215:12-14 (Hyde); and (ii) file extension, file size, and MD5 Hash values for *all* of the many documents for which such values were missing in the August Production, *see* Exs. RM 2-3, 5; Vol. II Tr. 225:9-227:9 (file extensions); *id.* at 234:2-11 (file sizes); *id.* at 244:5-17 (MD5 Hash values).[10]

Mr. Hyde confirmed that the metadata he extracted from the native files was accurate by studying the document properties and Relativity viewer renderings of some of the native files.  For example, using two illustrative emails, Mr. Hyde showed that he extracted the correct date sent value (which the government failed to provide) by confirming that the date value he extracted in reprocessing was the same as date shown on the email in Relativity's viewer rendering.  *See* Exs. RM 1, 10; Vol. II Tr. 218:14-219:8, 220:11-221:11 (Hyde); *see also, e.g.*, Ex. RM 2; Vol. II Tr. 227:10-25 (Hyde) (discussing a screenshot showing that a document produced as part of the August Production without a populated file extension value in fact "has a file extension and it should have been extracted out and populated out into the file extension field and the metadata fields provided").  These illustrative examples demonstrate that the native files provided by the government contained accurate metadata that the government *could* have processed and produced consistently with the Protocol (but for which it failed to do so).  *See* Exs. RM 1-7, 10-11.

---

[9]   Mr. Hyde did not perform this analysis for documents missing file names or custodian information because those metadata fields cannot be extracted from native files.  *See* Vol. II Tr. 239:6-12, 249:6-11 (Hyde).

[10]   The government previously acknowledged that it cannot evade its obligation to comply with the metadata requirements of the Protocol merely by producing native files.  *See* Dkt. 197 at 3 ("The government is not suggesting that simply because it is providing native files, it is permissible for it to produce documents in a manner inconsistent with the document protocol.").

Finally, Mr. Hyde demonstrated that the government's failures were not limited to a particular file type. Rather, his analysis showed that metadata deficiencies were pervasive in the August Production, affecting documents of all sorts, including email files, PDFs, Excel files, and images. *See* Ex. RM 11; Vol. II Tr. 228:4-232:2, 235:25-236:13, 246:4-15 (Hyde).

Mr. Hyde's findings stand in stark contrast to the government's stated—and oft-repeated—position that the missing metadata "did not exist in the underlying native files." Dkt. 197 at 2; *see also* Dkt. 162-1 at ¶ 16 ("With respect to missing metadata fields, this means that as far as the government is able to determine, the relevant data is missing in the underlying documents."); Dkt. 228 (Jan. 27, 2020 Hr'g Tr.) at 11:5-13:25. Based on his analysis, Mr. Hyde concluded that the August Production failed to comply with several requirements in the Protocol because the missing metadata did, in fact, exist, contrary to the government's prior representations. *See* Vol. II Tr. 253 (Hyde); *see also id.* at Tr. 196:22-197:2 ("The [government] didn't provide the metadata information or the fields that should have been provided, and in the format that it should have been provided . . . . The [government] also failed to include the native files, [and] to properly format date information.").[11]

Mr. Hyde's testimony was corroborated by the testimony of the D4/Special Counsel witnesses—experienced eDiscovery practitioners employed by the vendor that has been involved in this matter on behalf of Todd Morgan since the Pre-Protocol Production in 2018. These witnesses confirmed that the native files provided by the government as part of the August Production contained metadata that (i) could have been extracted by several different processing platforms, including those used by Mr. Bowman and LTSC; and (ii) the government was required, but nevertheless failed, to produce. *See* Dkt. 435; *see also* Vol. III Tr. 564:21-565:21 (Martin).

---

[11]   Mr. Hyde's analysis also demonstrated a pattern of failures by the government in connection with the Laptop Production. *See, e.g.*, Exs. RM 1-3, 5-6; Vol. II Tr. 197:13-19 (Hyde).

* * * *

The evidence shows conclusively that Defendants have met their burden to prove by a preponderance of the evidence that the August Production failed to comport with the Protocol.

## V. THE GOVERNMENT CANNOT AND DID NOT SHOW THAT ITS FAILURES TO COMPLY WITH THE PROTOCOL WERE EXCUSABLE.

### A. The Government Has Not Shown that Its Failure to Provide Metadata and Native Files Required by the Protocol Was Excusable.

The government agreed, and was ordered by Magistrate Judge Schroeder, to comply with the Protocol, including its requirement to "extract[] and provide[] in a .DAT file" all metadata information that "the processing software is able to extract" in a format consistent with Addendum A, except in the event of "circumstances beyond the producing party's control." Dkt. 27-1 at 2-4. However, the government did not—and cannot—demonstrate that its repeated failures to produce in .DAT files certain metadata that existed in the native files were caused by an inability to extract such metadata or were otherwise "due to circumstances beyond [its] control." The government's proffered explanations for these failures range from mere speculation to demonstrably false excuses, but they do nothing to undercut the conclusion that the government violated the Protocol, and that it did so repeatedly over time.

*First*, the government conceded that it was at fault for several violations of the metadata requirements in the Protocol. *See* Section IV(A), *supra*.

*Second*, the government admitted that it never attempted to process the data underlying the August Production pursuant to the Protocol's requirements, and therefore cannot credibly argue that its processing software was not "able to extract" the missing metadata. The government has no basis to claim that its processing platform "extracted what it could from the records that it could and didn't when it couldn't," Vol. V Tr. 645:17-18 (Marchese), especially in light of the government's repeated admissions that it controlled (and could adjust) the settings of its processing

platforms and, thus, that it could control what metadata those platforms extracted. *See, e.g.*, Marchese Tr. 68:6-21 (conceding that Nuix could have been set to capture a broader array of "sent date" fields); Vol. III Tr. 527:19-25, 562:6-9 (Bowman) (acknowledging that Nuix settings control what data is exported); Vol. III Tr. 534:10-19 (Bowman) (conceding that a Nuix setting applied by FHFA agents during processing was the reason MD5 Hash values were not created for some large documents).

In fact, it was not until the fourth day of testimony at the Hearing, faced with clear evidence that it could—and, in some instances, did—extract certain required metadata that it had previously said (falsely) Nuix was incapable of extracting, that the government finally conceded it would need to reprocess certain source files to determine why some metadata was not extracted. *See* Vol. IV Tr. 738:21-23, 747:19-749:11 (Mr. Penrose: "I think Mr. Marchese's view is that [reprocessing .OST files] may be necessary, in order to provide the Court an answer, which is ultimately what the Court, I think, wants, it may be necessary to dig deeper . . . .  Obviously, why we're here is to discuss whether the government provided discovery in an appropriate form. . . .  So what we're trying to do here is dig into if the technical explanation [] of why what was provided was in the form it was.").

This concession directly contradicted the government's earlier statements that it was not necessary to reprocess documents to determine that processing errors were not the cause of failures to provide metadata. *See* Vol. III Tr. 489:15-490:2 (Bowman) (Mr. Bowman admitting it never occurred to him to reprocess data once the Protocol was entered, nor after Defendants identified metadata issues, nor after Defendants confirmed that missing metadata was available in the native files provided by the government); *id*. at Tr. 483:16-23 (Mr. Bowman "confirmed [the missing metadata] was not a problem with the processing" by looking at file path information).

22

*Third*, the government's primary excuse—that the "vast majority" of documents missing metadata were extracted from container files, and that the metadata "did not exist" in the original source material, *see, e.g.*, *id.* at Tr. 412:17-19; 449:2-451:4 (Bowman), is facially implausible, internally inconsistent, and was disproven at the Hearing.

The government conceded at the Hearing (for the first time) that it did not produce the original native container files, but instead "created" files from records extracted from those container files, and produced those "created" files as "natives." *Id.* at Tr. 514:2-4 (Bowman) ("[I]n the standard practice, we open up the PST and we grab everything and put it in separate files for them, so they can look at it in review tools."); Marchese Tr. 29:3-12. However, the government also acknowledged that it did not extract the metadata it provided to Defendants from these "created" files; instead, it provided metadata extracted from the container file itself, which did not provide useful information regarding the individual records. *See* Vol. III Tr. 545:12-14 (Bowman); *see also id*. at Tr. 412:17-19 (the "vast majority" of documents missing metadata were "due to how we extracted it" from container files).

At the Hearing, however, Defendants demonstrated (and the government did not dispute) that it was possible to extract metadata required by the Protocol from documents the government says it derived from container files. *See* Exs. RM 1, 10 (showing exemplar emails originating in an .OST file for which the government failed to provide metadata, but from which Mr. Hyde was able to extract metadata, including date sent and file extension); Ex. D (showing results of D4/Special Counsel's reprocessing analysis). Further, Mr. Marchese acknowledged that, in the context of an exemplar email sourced from an .OST file, the produced "derived native" file had "good" metadata that was missing from the load file provided by the government. Vol. V Tr. 635:18-23 (Marchese). Defendants also demonstrated that the government could have used Nuix or Venio to extract this "good" metadata. *See* Vol. III Tr. 565:3-21 (Martin). And, in fact, the

government did provide metadata for *some* documents that it extracted out of container files.  *See* Vol. V Tr. 696:23-698:16 (Schatz); Ex. R (showing date sent metadata provided for emails extracted from .OST files).

Notably, the government agreed that some of the metadata it could have extracted from the "derived natives" would have had practical value for Defendants.  *See* Marchese Tr. 110:7-16 (discussing the importance of file extensions).  And yet, seeking to distract from another of its failures, the government insisted, without evidentiary support, that providing metadata for the extracted documents could negatively impact the integrity of the data.  *See* Vol. V Tr. 666:12-16 (Marchese).

"Derived natives" are not true "native" files—*i.e.*, files in "the format in which they are ordinarily used and maintained"—and the government's provision of these "derived" files did not satisfy its obligation under the Protocol to produce files in their "native format."  Dkt. 27-1 at 1. That the government has argued to the contrary, while simultaneously arguing that its failure to extract (let alone produce) what it concedes is available metadata in those "derived natives" is justified because that metadata is insufficiently reliable, defies common sense—and the Protocol. Even if the government were correct in asserting that producing the "derived natives" satisfied the Protocol (and it is not), then it is all the more obvious that the government failed to comply with the Protocol's metadata requirements when it did not provide metadata that it could have extracted for hundreds of thousands of documents in the August Production.  In either case, the government violated the Protocol and has no reasonable excuse for doing so.

Ultimately, the government's argument that it need not provide metadata for documents derived from container files is unreasonable on its face.  The government acknowledged at the Hearing that "e-mails typically reside in container files."  Vol. III Tr. 528:1-3 (Bowman).  Under any reading of the Protocol, the government was required to produce metadata for emails, and it

is nonsensical to suggest that any of the Defendants would have agreed to the Protocol if they knew the government read it otherwise.  Of course, the government never raised this issue during negotiations regarding the Protocol.  *See id.* at Tr. 545:10-546:6.

*Fourth*, even if the government were correct that the processing platforms it used could not extract required metadata for hundreds of thousands of documents (again, it is not), the government acted in bad faith by failing to disclose that fact to Defendants while negotiating the Protocol.  As the government's professional expert testified, it is critical for the parties to know in advance the capabilities—and limitations—of the applicable processing tools.  *See* Marchese Tr. 68:2-8 ("The Court: [S]o, in other words, to understand what you're negotiating for a document protocol, isn't it important that the parties understand how those fields or what software is going to be used to create the fields? A: Yeah. I think that is a fair statement. You really have to know what your tools do and then what output options there are.").  Here, the government failed to do what their paid expert himself suggested.

> **B.**   **The Government's Failure to Provide Metadata Required by the Protocol Significantly Impeded Mr. Morgan's Ability to Make Use of the Productions.**

The metadata requirements of the agreed-upon, court-ordered Protocol exist for a reason: the metadata listed therein is essential to conduct a meaningful review and analysis of the underlying documents, and the government's failure to provide it has had a significant impact on Mr. Morgan's ability to use the production and to prepare his defense.

Mr. Hyde testified at the Hearing that the government's metadata deficiencies made it unnecessarily difficult, if not impossible, to refine a review set, filter by custodian and/or document type, confirm duplicates, and create an accurate chronology of emails.  *See* Vol. II Tr. 313:15-314:10 (Hyde).  Mr. Hyde further testified that, "[w]ithout the proper metadata information, we can't run the proper searches. . . .  [I]f a field value is missing and you're trying to run a search on this particular field, . . . it won't be included in the search." *Id*. at Tr. 202:3-15 (Hyde).  Mr. Hyde

added that it is "harder . . . or impossible" to refine information using filtering techniques if the relevant field is not reliably provided. *Id*. Mr. Hyde testified that these issues are especially problematic where, as here, the number of documents is significant. *See id*. at Tr. 308:14-17 (Hyde) ("With the lack of the particular metadata information in structuring a review, your review set is going to be much larger because you won't be able to rely on certain information to cull down the data for a smaller refined set for review.").

Testimony at the Hearing demonstrated that each of the metadata requirements with which the government failed to comply affected Defendants' ability to use the documents produced:

- Date metadata is important, particularly in large productions, because it allows the user to filter and identify particular documents, and to view email communications in chronological order. *See* Vol. II Tr. 213:4-22 (Hyde).

- File extension metadata allows the user to filter documents by file type. *See* Vol. II Tr. 244:18-225:2 (Hyde). This is true even where the file extension is "assigned" during processing, as Mr. Marchese acknowledged. *See* Marchese Tr. 30:5-10 ("Q: And what, if any, indication would the use of EML [a file extension "assigned" to emails extracted from container files] have from a trained eye? A: You can tell that comes from an e-mail system. Q: Why so? A. Because you know that is an extension that would be assigned to a singular file that was exported."); *id.* at 110:12-16 ("One of the Defendant's experts testified about sorting in Relativity by file extension, and that it would be more difficult to do that than sorting the same information, for example, in the native file path. So that could be one context.").

- Custodian information identifies the person or department that owned or controlled the document. *See* Dkt. 27-1 at 5. The producing party is the only party with access to this information, making it critically important for the producing party to provide it by manually entering it into the relevant field. *See* Ex. RM 6; Vol. II Tr. 252:16-253:13 (Hyde) (custodian information cannot reliably be determined by reference to other fields, especially in a large production).

- File name metadata shows the original file name of the document as it existed in the source material, and is particularly necessary where, as here (and per the Protocol), documents are identified in productions by Bates numbers, not file names. *See* Ex. RM 4; Vol. II Tr. 237:18-239:2 (Hyde). One cannot obtain a file name by opening or reprocessing native files, making the original file name metadata critical for a review.

- MD5 Hash values are unique fingerprints used to identify duplicates. *See* Vol. II Tr. 243:7-14 (Hyde). Mr. Bowman initially testified at the Hearing, without evidence, that MD5 Hash values are not important, but he then contradicted himself and acknowledged that MD5 Hash values are a "standard field many people ask for" and that they *are* important

in assessing data integrity and in identifying whether a document has been altered.  *See* Vol. II Tr. 332:9-14 (Bowman).  In fact, Mr. Bowman said he had helped participate in the Department of Justice's effort to draft the Federal Rule of Evidence that allows MD5 Hash values to be used in authenticating documents, *see id.* at Tr. 416:16-22, undercutting any *post-hoc* attempt by the government to downplay the importance of this metadata field. Moreover, the government's paid expert conceded on cross-examination that MD5 Hash values are useful in performing critical forensic analyses, and acknowledged that his own firm advertises the value of conducting such MD5 Hash-enabled analyses to prospective clients.  *See* Marchese Tr. 116:13-118:19.

- File size metadata enables the user to filter out documents that lack substance when refining a search or review set.  *See* Vol. II  Tr. 233:18-23 (Hyde).

* * * *

In summary, the government conceded at the Hearing that it failed to comply with various provisions in the Protocol.  And its excuses for other proven violations are without merit and serve only to reinforce the government's cavalier attitude toward Defendants' rights—and its own obligations.  The Hearing not only clarified, but also *added* to what Defendants have already shown is the government's ongoing pattern of neglect and misconduct.[12]  The government did not—and cannot—meet its burden to show otherwise.

---

[12]    That the government's conduct is part of a pattern of gross negligence and/or intentional misconduct is further demonstrated by the way it has skirted its obligations to de-duplicate the documents in the late-produced Laptop Production. On November 22, 2019, buried in its reply to a motion filed by Mr. Morgan, the government first disclosed its failure to process and produce the three computers, and inexplicably—and without evidence— suggested that its tardy production was insignificant because "it is likely that many or most of the items on the laptops are duplicative of items already produced."  Dkt. 143 at 5-6.  The Court instructed the government on November 25, 2019 to determine whether there were non-duplicative items on the laptops, *see* Dkt. 150 (Nov. 25, 2019 Hr'g Tr.) at 30:22-12, and followed up with the government on this issue during multiple status conferences. *See* Dkt. 228 (Jan. 27, 2020 Hr'g Tr.) at 30:3-33:24 (government representing that it had started, but not completed, such analysis); Dkt. 282 (Mar. 10, 2020 Hr'g Tr.) at 64:23-65:15 (government acknowledging it had not yet hired a vendor to undertake the analysis).  Now, more than nine months after representing to the Court that it would do so, the government *still* has not completed—and may not have even started—its long-promised de-duplication efforts. *See* Vol. III Tr. 421:6-17 (Bowman).  The government has sought to blame its delay on administrative red tape, saying it needed to obtain approval from the Department of Justice to retain an outside vendor. *See* Dkt. 282 (Mar. 10, 2020 Hr'g Tr.) at 64:23-65:15 (AUSA Penrose saying he could not provide a date for completing the de-duplication analysis because there was a delay in getting funding to hire a vendor to do it).  But these excuses are belied by the apparent ease with which the government retained Mr. Marchese's firm in March 2020—at a cost approaching, if not greater than, $100,000—to spend more than 100 hours preparing to testify at the Hearing.

27

## VI.     CONCLUSION

More than a year has passed since the court-ordered deadline for the government to produce all discovery in its possession consistent with the Protocol, and nearly seven months have passed since Mr. Morgan filed his pending motion to dismiss the superseding indictment on speedy trial grounds—a motion supported in part by the government's failure to comply with its discovery obligations and its apparent inattention to correcting its discovery failures.  *See* Dkt. 217 at 19-23.

Over the past few months, the Court and Defendants have dedicated significant time, effort, and resources to understanding the reasons for the government's failures to comply with the court-ordered Protocol and to provide all discovery by the court-ordered deadline.  The government has had ample opportunity to undertake a meaningful analysis of its productions and to belatedly correct, or at least to honestly explain, its failures to comply with the Protocol.  Instead, the government chose to dither and obfuscate.  It chose to wait for Defendants to slog through its incomprehensible and hopelessly deficient productions, which did not even include all data necessary for Defendants to undertake a full analysis.  And when Defendants raised issues, the government chose to make demonstrably incorrect and unsubstantiated excuses, and attempted to characterize its failings as natural consequences of working with electronic discovery.

But as we now know, the truth is much more simple.  The government's many concessions at the Hearing make clear that it *has known for at least several months* how and why it violated certain provisions of the Protocol, but that it chose not to share that information with the Court or with Defendants.  And by withholding that information, the government not only violated its speedy trial obligations, it also wasted the Court and Defendants' time and resources by necessitating a five-day evidentiary hearing (during a pandemic, no less) in order to pry from the government truths it has known all along.

The government did not call Mr. Bowman, anyone from LTSC or FHFA, or any other witness with direct knowledge of its productions in this case; instead, it relied on a professional witness who (i) had no involvement with the collection, processing, or production of the electronic discovery at issue, (ii) was provided limited information, and (iii) did not initially undertake the analysis the government eventually conceded he would need to perform in order to support its theory of alleged compliance with the Protocol.  The reason for the government's odd approach to the Hearing is now clear: the government knows it did not make a good faith effort to comply with the Protocol, and its behavior is inexcusable.

For the foregoing reasons—and for the reasons previously stated in his filings in support of his motion to dismiss, *see* Dkts. 217, 279—Mr. Morgan respectfully requests that the Court dismiss the superseding indictment with prejudice.  The government must not be permitted to pursue a criminal indictment relying on evidence so tainted by blatant violations of court orders, misrepresentations, and misconduct, nor to keep Defendants in limbo perpetually awaiting a trial on evidence the government cannot—or will not—produce in manner consistent with its court-ordered obligations.

Dated:   August 14, 2020                    GIBSON, DUNN & CRUTCHER LLP
         New York, NY


                                   By:    _____/s/ *Joel M. Cohen*_____
                                          Joel M. Cohen
                                          Lee G. Dunst

                                          200 Park Avenue
                                          New York, NY 10166-0193
                                          Telephone:  212.351.4000

                                          Attorneys for Defendant Robert C. Morgan

29